Edward K. Blodnick (EB1796)
Thomas R. Fazio (TF0871)
Steven R. Talan (ST5353)
BLODNICK FAZIO & ASSOCIATES, P.C.
1325 Franklin Avenue, Suite 555
Garden City, New York 11530
(516) 280-7105
eblodnick@blodnickfaziolaw.com

**CV 13          519**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x

MARK LAFFEY, PHILIP LAFFEY,                                  Index No.
U.S. 1 LAFFEY REAL ESTATE CORP. d/b/a
LAFFEY FINE HOMES, LAFFEY ASSOCIATES, LLC.,
eREALTY TITLE AGENCY CORP.,
TCG GROUP, INC., 55 NORTHERN BLVD., LLC,
US 1 LAFFEY REAL ESTATE OF BROOKVILLE, INC.,
US 1 LAFFEY REAL ESTATE OF NEW HYDE
PARK, INC., and GREENVALE COLONIAL HOUSE, LLC,        **VERIFIED COMPLAINT**

                    Plaintiffs,

          -against-
                                                             Jury Trial Demanded

EMMETT LAFFEY, GREGORY BERKOWITZ,
JOHN SCHOONMAKER, SCOTT CONLON,
          the "Ringleader Defendants",
and

LAFFEY FINE HOMES INTERNATIONAL LLC,
US 1 LAFFEY OF WILLISTON PARK, INC.
          the "Enterprise Defendants",

and

KAREN BERKOWITZ LAFFEY,
DEE DEE BRIX, MARIA BABAEV,
NATALIE McCray, REGINA ROGERS,
JOE PIMENTA, JIMMY TUBBS,
SONNY DeCLARA, LISA CERRETA,

1

CARA BUSTO, IRINA PASHINSKY
DORA ZELYAKOVSKY, PETER MORRIS,
CHRISTOPHER HEIN, ELAINE LUPO,
JOHN DOE No. 1,
JOHN DOE No. 2, and
JOHN DOE No. 3,
             the "Conspiring Individual Defendants"

and

QUONTIC BANK,
THE ROSLYN SAVINGS BANK, A DIVISION OF
NEW YORK COMMUNITY BANK,
GREATER JERICHO CORP., MULTIPLE LISTING
SERVICE OF LONG ISLAND, INC.,
WHERETOLIVE.COM INC.,
LINCOLN LAND SERVICES, LLC, and
SIGNATURE PROPERTIES OF
HUNTINGTON, LLC a/k/a SIGNATURE
PREMIER PROPERTIES,

             the "Conspiring Corporate Defendants".
-------------------------------------------------------------------------------x

       Plaintiffs, by their attorneys, BLODNICK FAZIO & ASSOCIATES, complaining of the

Defendants, allege:

## INTRODUCTION

     1.       This is an action that seeks to terminate an ongoing fraudulent scheme perpetrated

against the Plaintiffs herein and to recover damages pursuant to the Racketeering Influenced and

Corrupt Organization ("RICO") statutes, 18 U.S.C. §1962(b), 18 U.S.C. § 1962(c), and 18

U.S.C. §1962(d);  and for damages resulting from (a) common law fraud; (b) aiding and abetting

fraud; (c) unjust enrichment; (d) breach of fiduciary duty; and (e) as the result of the actions of

faithless servants.

2.       The Ringleader Defendants were formerly employees of Plaintiff LAFFEY FINE HOMES ("LFH").

3.       The fraudulent scheme at issue was begun by the Ringleader Defendants while employed at LFH where they occupied positions of trust, as part of a scheme to defraud and seize control of the assets, opportunities and business of LFH and the other jointly owned Laffey businesses and convert them to their own nefarious purposes.

4.       To date, Plaintiffs have to date uncovered and identified ***over One Million Dollars ($1,000,000)*** which was stolen, embezzled and/or converted by Defendants.  Upon information and belief, the Defendants' scheme has resulted in greater damage than is yet known to the Plaintiffs as the defendants' schemes and fraudulent conduct continue into the present.

5.       While still employed at LFH, the Ringleader Defendants, in concert with and through the use of some or all of the Enterprise Defendants, Conspiring Individual Defendants and/or Conspiring Corporate Defendants, have conceived, plotted and continue to execute a plan to convert the business, goodwill, assets and opportunities of Plaintiffs to their own use and benefit, through fraud, deceit and physical assaults and intimidation, among other means.

6.       In part through the use of mails, wires, telephone lines, emails, the internet and bank fraud, the Defendants have furthered and advanced the scheme and continue to do so.

7.       The scheme has included, without limitation: theft, conversion and/or usurpation of monies, real estate sales listings and commissions, brokers, internet domain names, email systems and websites; interference with employment or contractor relationships; interference with potential business relationships; attempts to sabotage the businesses and the growth of the businesses; misappropriation of trade secrets; improper competition using insider information and trade secrets; physical assaults and intimidation; implementation of intentionally lax controls

3

and oversights; improper use, sequestration and diversion of corporate assets; usurpation of corporate opportunities; staging of misleading events; and other actions designed to enable them to defraud, divert and embezzle vast sums from LFH and the other Plaintiff entities and utilize LFH's and the other Plaintiff entities' resources to create fraudulent competing entities building upon LFH's and the other Plaintiff Entities' good name and reputation.

## JURSIDICTION AND VENUE

8.      This Honorable Court has jurisdiction pursuant to 28 U.S.C. 1331 based upon the existence of a federal question of law and 18 U.S.C. 1964 (a) and (c) conferring jurisdiction in the United States District Courts in actions brought by persons seeking redress for injuries in his business or property by reason of a violation of 18 U.S.C. § 1962.

9.      This Honorable Court has Supplemental Jurisdiction over Plaintiffs' state and common law claims pursuant to 28 U.S.C. §1367.

10.      Venue is proper in the United States District Court for the Eastern District of New York based upon 28 U.S.C. § 1391 as this is the judicial district in which one or more of the defendants reside and because this is the district in which a substantial amount of the activities forming the basis of the Complaint occurred.

## DEFINITIONS

11.      As used in this Complaint, "mail", "mails" , "mailing", "mailed", or "letter" includes the use of these terms as used in 18 U.S.C. § 1341.

12.      As used in this Complaint, "wire", "wires", "wired", "wiring", or "wire communication" or "telephone" includes the use of these terms as used in 18 U.S.C. § 1343.

13.     As used in this Complaint, "fictitious", "false", or "assumed title", "name" or "address or name other than his proper name", includes the use of these terms as used in 18 U.S.C. § 1342.

14.     As used in this Complaint, "wire", "radio", or "transmits or causes to be transmitted by means of wire", "interstate or foreign commerce" includes the use of these terms as used in 18 U.S.C. § 1343.

15.     As used in this Complaint, "financial institution", "monies", "funds", "credits", "assets", "securities", or "other property owned by, or custody or control of a financial institution", includes the use of these terms as used in 18 U.S.C. § 1344.

16.     As used in this Complaint "attempts", "conspires" or "conspiracy" includes the use of these terms as used in 18 U.S.C. § 1349.

## FACTS AS RELEVANT TO THE RICO CLAIMS

### A. The Enterprise

17.     At all times hereinafter relevant, the "Enterprise" as discussed herein existed within the meaning of 18 U.S.C. 1961(4).  This Enterprise is an entity that engaged in activity affecting interstate and foreign commerce, and was an Enterprise at all times relevant to this Complaint.

18.     The Defendants participated in the operation and management of each aspect of the Enterprise and conducted its affairs through their pattern of unlawful activity with intent to defraud, corrupt, cheat, steal and convert the money and property of the Plaintiffs and members of the public.

19.     Each of the Defendants has knowingly and intentionally engaged in acts to further the conspiracy to defraud Plaintiffs, to convert checks, to divert payments and clientele from Plaintiffs for the benefit of the Defendants and to conceal the existence of the Enterprise.

## B. Membership of the Enterprise

20.     The Enterprise is an association of corporate members and individuals comprised of the Defendants. Each of the Defendants was associated with the business of the Enterprise through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(b).

21.     Members of the Enterprise, who intentionally engaged in the plan to defraud Plaintiffs, misappropriate checks, misappropriate commissions, defraud the customers of the Plaintiffs and avoid the detection of law enforcement and licensing officials include the Defendants herein.

## C.     Purposes of the Enterprise

22.     The purpose of the Enterprise is to convert money and other assets from Mark and Philip, LFH and the other Plaintiff entities, without their knowledge or consent, for the benefit of Defendants, and either to obtain complete control of LFH and the other Plaintiff entities and their revenues, or, in the alternative, to sufficiently devalue LFH and the other Plaintiff entities through the unlawful disruption and usurpation of LFH's and the other Plaintiff entities' business so that Defendants could purchase LFH's and the other Plaintiff entities' shares and/or assets at an artificially low price.

## I. THE PARTIES

### A. The Plaintiffs

23.     Plaintiff MARK LAFFEY ("Mark") is a natural person, who, at all times hereinafter relevant, resided in Oyster Bay (Nassau County), New York and is the owner of

6

Plaintiff U.S. 1 LAFFEY REAL ESTATE OF BROOKVILLE, INC. and a one- third shareholder of the remaining corporate plaintiffs.

24.     Plaintiff PHILIP LAFFEY ("Philip") is a natural person, who at all times hereinafter relevant, resided in the City, County and State of New York and is the owner of Plaintiff U.S. 1 LAFFEY REAL ESTATE OF NEW HYDE PARK, INC. and a one-third shareholder of the remaining corporate plaintiffs.

25.     Plaintiff U.S. 1 LAFFEY REAL ESTATE CORP. ("U.S. 1 Laffey") was and continues to be a New York domestic business corporation, doing business under the assumed name of Laffey Fine Homes ("LFH") with a place of business located at 55 Northern Boulevard, Greenvale, New York 11548 (the "Greenvale Premises"), is a real estate agency and is in the business of providing residential real estate brokerage and related services, for profit.

26.     Plaintiff LAFFEY ASSOCIATES, LLC ("Laffey Associates") was and continues to be a New York domestic limited liability company with a place of business located at the Greenvale Premises.

27.     Plaintiff TCG GROUP, INC. ("TCG") is a domestic corporation with a principal place of business located at the Greenvale Premises. TCG is the corporate owner of the Greenvale Premises.

28.     Plaintiff, eREALTY TITLE AGENCY CORP. ("eRealty") was and continues to be a New York domestic business corporation with a place of business located at the Greenvale Premises, having recently relocated from 333 Jericho Turnpike, Jericho, NY. eRealty is a title agency providing title insurance and title searches, for profit.

29.     Plaintiff, 55 NORTHERN BLVD., LLC ("55 Northern"), was and continues to be a New York domestic limited liability company with a place of business located at the Greenvale

Premises. 55 Northern is a real estate management company which manages the Greenvale Premises.

30.     Plaintiff U.S. 1 LAFFEY REAL ESTATE OF NEW HYDE PARK, INC. ("NHP") is a domestic corporation established under the laws of the State of New York with a principal place of business at 1643 Hillside Avenue, New Hyde Park (Nassau County), New York 11040. NHP is a real estate agency and is in the business of providing residential real estate brokerage and related services, for profit.

31.     Plaintiff U.S. 1 LAFFEY REAL ESTATE OF BROOKVILLE, INC. ("Brookville") is a domestic corporation established under the laws of the State of New York with a principal place of business at 6336 Northern Boulevard, East Norwich (Nassau County), New York 11732. Brookville is a real estate agency and is in the business of providing residential real estate brokerage and related services, for profit.

32.     Plaintiff GREENVALE COLONIAL HOUSE, LLC ("Colonial") is a domestic limited liability corporation with a principal place of business at the Greenvale Premises. Colonial was at all times herein relevant engaged in a joint venture with non-party WELLS FARGO BANK ("Wells Fargo") that owned and until December 31, 2012 operated a mortgage brokerage FIRST ALLIED HOME MORTGAGE, INC. ("First Allied") which recently relocated to the Greenvale Premises from 333 Jericho Turnpike, Jericho, NY. .

**B. The Ringleader Defendants and their involvement**

33.     Upon information and belief, at all times hereinafter relevant, Defendant EMMETT LAFFEY ("Emmett") was a natural person who resides at 5 West Gate Road, Lloyd Harbor (Suffolk Co.), New York 11743.

8

34.     Emmett is presently the owner of a one-third interest in LFH, Laffey Associates, eRealty, TCG, 55 Northern, and Colonial.

35.     Upon information and belief, Emmett is the sole owner of the defendant enterprise US 1 LAFFEY OF WILLISTON PARK, INC. and the defendant enterprise LAFFEY FINE HOMES INTERNATIONAL LLC.

36.     Upon information and belief, at all times hereinafter relevant, Defendant GREGORY BERKOWITZ ("Berkowitz") is a natural person residing at 15 Beaverhill Lane, Huntington (Suffolk County), New York 11743.

37.     After his termination from LFH, Berkowitz became a rabble-rouser for the RICO enterprise, going to various LFH branch offices where he tries to strong arm his way into the facilities, as well as sending multiple emails and text messages and placing multiple phone calls to the employees and agents of those branch offices, in an attempt to make trouble for and disrupt the regular business operations.

38.     Months after his termination from LFH, Berkowitz continues and has continued to utilize the internet to fraudulently hold himself out as an executive of LFH to the general public.

39.     Upon information and belief, at all times hereinafter relevant, Defendant JOHN SCHOONMAKER ("Schoonmaker") was a natural person who resides at 428 Harbor Road, Laurel Hollow (Nassau County), NY 11724.

40.     On or about April 18, 2012, to avoid detection of his conversion of corporate funds and improper conduct at eRealty and First Allied, Emmett sought to install Schoonmaker as the "new office manager" without the knowledge or consent of Mark or Philip.

41.     While employed at LFH, Schoonmaker worked as an insider for Emmett, feeding him information for use in the fraudulent enterprise and taking direction solely from Emmett.

42. Schoonmaker was also repeatedly and flagrantly insubordinate to Mark and Philip.

43. When Schoonmaker's nefarious actions were discovered, his employment was terminated on September 4, 2012.

44. Thereafter, Schoonmaker, who was asked to vacate his offices at LFH's corporate headquarters, moved into Emmett's personal office at LFH headquarters, the Greenvale Premises on September 7, 2012 and became a rabble-rouser for the RICO enterprise, going to various LFH branch offices where he tried to strong arm his way into the facilities in an attempt to make trouble for and disrupt the regular business operations.

45. By way of one example, on September 11, 2012, he and Berkowitz both insinuated themselves into a management meeting of LFH without invitation or authority, with the clear purpose of causing disruption to LFH's business operations.

46. Upon information and belief, at all times hereinafter relevant, Defendant SCOTT CONLON ("Conlon") was a natural person who resides at 78 E 23rd Street, Huntington Station (Suffolk Co.), New York 11746-3215, and is an attorney at law duly admitted to practice before the Courts of the State of New York.

47. Utilizing his position of trust within the LFH organization, Conlon furthered the Ringleader Defendants' scheme to interrupt the ongoing business of LFH by (1) creating false documents that were not part of the corporate records; (2) withholding vital information from LFH's directors about pending litigation and deals; (3) obstructing LFH from preparing a proper defense to litigation; (4) providing false information about certain litigation matters; and (5) providing confidential inside information to the Ringleader Defendants enabling them to further pursue their scheme.

48.      Upon information and belief, the Ringleader Defendants, while employed at LFH made use of the corporate accounts and embezzled from LFH to help finance and augment lavish lifestyles and grandiose perks, which included *inter alia* expensive homes along the Gold Coast of Long Island, lavish vacations at the company's expense, elite gym memberships for each of the ringleaders paid through Emmett's American Express Card and then fraudulently charged as an expense to LFH, and dining at Long Island's premier restaurants.

**C. The Enterprise Defendants and their involvement**

49.      Upon information and belief, at all times hereinafter relevant, Defendant LAFFEY FINE HOMES INTERNATIONAL LLC, ("International") is a domestic limited liability company with a principal place of business in Nassau County, New York used as a front for the Defendants' schemes to defraud the Plaintiffs, banks and the general public and as a vehicle to continue to maintain their lavish lifestyle and perks at the expense, directly or indirectly, of LFH and the other Plaintiff Entities.

50.      International, like LFH, is a real estate agency and is purportedly in the business of providing residential real estate brokerage and related services, for profit.

51.      Upon information and belief, International is an improper and unauthorized competing business to LFH and is wholly owned, controlled and operated by Emmett.

52.      Upon information and belief, International is managed and directed by Emmett, Schoonmaker, Berkowitz and Conlon.

53.      Upon information and belief, at all times hereinafter relevant, Defendant US 1 LAFFEY OF WILLISTON PARK, INC. ("WP") is a domestic business corporation with a principal office at 191 Hillside Avenue, Williston Park (Nassau County), New York 11596.

54.     WP is a real estate agency and is purportedly in the business of providing residential real estate brokerage and related services, for profit.

55.     Upon information and belief, at all times hereinafter relevant, Defendant Emmett controlled and or owned WP and improperly used WP as a place to "park" real estate listings for Berkowitz so that he could divert them from his employers at LFH.

**D. The Conspiring Defendants and their involvement**

56.     Upon information and belief, at all times hereinafter relevant, Defendant KAREN BERKOWITZ LAFFEY ("Karen") was a natural person who resides at 5 West Gate Road, Lloyd Harbor (Suffolk County), New York 11743.

57.     Karen is the wife of Ringleader Defendant Emmett Laffey.

58.     Upon information and belief, Karen conspired with her husband, Ringleader Defendant Emmett, to defraud Plaintiffs of funds through the creation of a fraudulent and no-show job on the books of LFH for which she was unjustly compensated at the expense of LFH.

59.     Karen has been on the payroll of LFH for years, at a cost of over ***Four Hundred Seventy One Thousand*** Dollars since 2006, for which she does and has done no work.

60.     The other principals of the various Laffey business entities do not have individual family members on the payroll of the jointly owned entities in that manner.

61.     Upon information and belief, at all times hereinafter relevant, Defendant REGINA ROGERS ("Rogers") was a natural person who resides at 8 Matinecock Court, Locust Valley (Nassau County), New York 11560.

62.     Upon information and belief, Rogers conspired with the Ringleader Defendants to divert listings and commissions away from Plaintiffs and into the pockets of the Ringleader Defendants.

63.     Upon information and belief, at all times hereinafter relevant, Defendant DEE DEE BRIX ("Brix") was a natural person who resides at 17 Danis Avenue, Glen Cove (Nassau County), New York 11545.

64.     Upon information and belief, Brix conspired with the Ringleader Defendants to divert listings and commissions away from Plaintiffs and into the pockets of the Ringleader Defendants.

65.     Upon information and belief, at all times hereinafter relevant, Defendant MARIA BABAEV ("Babaev") was a natural person who resides at 113 Villa Place, Roslyn Heights (Nassau County), New York 11577.

66.     Upon information and belief, Babaev conspired with the Ringleader Defendants to divert listings and commissions away from Plaintiffs and into the pockets of the Ringleader Defendants.

67.     Upon information and belief, at all times hereinafter relevant, NATALIE McCRAY ("McCray") was a natural person who resides at 12 Franklin Avenue, Glen Cove (Nassau County), New York 11542.

68.     Upon information and belief, McCray conspired with the Ringleader Defendants to divert listings and commissions away from Plaintiffs and into the pockets of the Ringleader Defendants.

69.     Upon information and belief, at all times hereinafter relevant, Defendant JOE PIMENTA ("Pimenta") was a natural person who has a business address at 191 Hillside Avenue, Williston Park (Nassau County) New York.

13

70.     Upon information and belief, Pimenta conspired with the Ringleader Defendants to divert listings and commissions away from Plaintiffs and into the pockets of the Ringleader Defendants.

71.     Upon information and belief, at all times hereinafter relevant, Defendant JIMMY TUBBS ("Tubbs") was a natural person who resides at 110 Brook Street, Garden City (Nassau County), New York.

72.     Upon information and belief, Tubbs conspired with the Ringleader Defendants to divert listings and commissions away from Plaintiffs and into the pockets of the Ringleader Defendants.

73.     Upon information and belief, at all times hereinafter relevant, Defendant SONNY DeCLARA ("DeClara") was a natural person residing at 682 Second Place, Garden City South (Nassau County), New York 11530.

74.     Upon information and belief, DeClara conspired with the Ringleader Defendants to divert listings and commissions away from Plaintiffs and into the pockets of the Ringleader Defendants.

75.     Upon information and belief, at all times hereinafter relevant, Defendant LISA CERRETA ("Cerreta") was a natural person residing at 51 Bright Street, Westbury (Nassau County), New York 11590.

76.     Upon information and belief, Cerreta conspired with the Ringleader Defendants to divert listings and commissions away from Plaintiffs and into the pockets of the Ringleader Defendants.

14

77.    Upon information and belief, at all times hereinafter relevant, Defendant CARA BUSTO ("Busto"), was a natural person residing at 25 Moscato Street, Huntington (Suffolk County), New York 11743.

78.    Busto was employed by LFH as a Secretary at the Syosset (Nassau County) office of LFH.

79.    Upon information and belief, Busto conspired with the Ringleader Defendants to disrupt the operation of LFH's Syosset Office in an attempt to get valued agents and employees to leave the office.

80.    In one blatant example, Busto precipitated a shouting match with one of the top producing agents in that office, telling her to "go fuck" herself.

81.    Busto generally roiled the atmosphere at the Syosset office with the aim of making it an uncomfortable place to work in order to make it easier for the Ringleader Defendants to entice the top producing agents there to leave.

82.    Upon information and belief, at all times hereinafter relevant, defendant IRINA PASHINSKY ("Pashinsky")  was a natural person who resided at 125 Oceana Dr E, Apt 2D, Brooklyn (Kings County), New York 11235-6692

83.    Upon information and belief, at all times hereinafter relevant, DORA ZELYAKOVSKY ("Zelyakovsky") was a natural person who resided at 2310 East 65th Street, Brooklyn (Kings County), New York 11234.

84.    Upon information and belief, Zelyakovsky and Pashinsky conspired with the Ringleader Defendants to convert the assets and property of Colonial away from Plaintiffs and into the hands of the Ringleader Defendants in order to set up a new joint mortgage brokerage venture with defendant QUONTIC BANK.

85.     In addition, Defendant Pashinsky, even though she is no longer employed by or associated with LFH, continues to show up at LFH offices, including without limitation the Great Neck office, to try to attend staff meetings there.

86.     Upon information and belief, at all times hereinafter relevant, Defendant PETER MORRIS ("Morris"), is a natural person and resides at 25 Bouton Road, Huntington (Suffolk County), New York 11743-1046 and has a principal places of business at 157 East Main Street, Huntington (Suffolk County), New York 11743 and 17 East Carver Street, Huntington (Suffolk County), New York 11743.

87.     Upon information and belief, Morris conspired with the Ringleader Defendants to siphon away sales agents from offices of LFH with the intent that those offices would be driven out of business furtherance of the Ringleader Defendants' scheme.

88.     Upon information and belief, at all times hereinafter relevant, Defendant CHRISTOPHER HEIN ("Hein") is a natural person and resides at 2004 Midlane South, Muttontown, NY 11791-9674 and is a principal of Defendant LINCOLN LAND SERVICES, LLC, a title company that competes with Plaintiff eRealty.

89.     Upon information and belief, at all times hereinafter relevant, Defendant ELAINE LUPO ("Lupo") is a natural person and resides at 14 Hemlock Lane, Glen Cove, NY 11542.

90.     Defendant Lupo is a childhood friend of Defendant Karen Berkowitz Laffey, the wife of Ringleader Defendant Emmett Laffey.

91.     Upon information and belief, at all times hereinafter relevant, Defendant JOHN DOE No. 1 ("Doe 1") is a natural person and resides in the State of New York whose identity is presently unknown to the Plaintiffs. Upon further information and belief, Doe 1 is one (or more individuals) who, in concert with or at the direction of the Ringleader Defendants and in

16

furtherance of their illegal schemes, cut and severed the telephone lines and wires of the Plaintiffs' Offices for eRealty located at 333 Jericho Turnpike, Jericho (Nassau County), New York 11753.

92.     Upon information and belief, at all times hereinafter relevant, Defendant JOHN DOE No. 2 ("Doe 2") is a natural person and resides in the State of New York whose identity is presently unknown to the Plaintiffs. Upon further information and belief, Doe 2 is one or more individuals who have conspired with Defendants to commit the fraud and other acts complained of herein.

93.     Upon information and belief, at all times hereinafter relevant, Defendant JOHN DOE No. 3 ("Doe 3") is a natural person and resides in the State of New York whose identity is presently unknown to the Plaintiffs. Upon further information and belief, Doe 3 is one or more individuals who have conspired with Defendants to commit the fraud and other acts complained of herein.

**E. The "Conspiring Corporate Defendants" and their involvement**

94.     Upon information and belief, at all times hereinafter relevant, defendant QUONTIC BANK ("Quontic"), is a federally chartered savings association with a principal office located at 3 Grace Avenue, Great Neck (Nassau County), New York 11021.

95.     Upon information and belief, Defendant Quontic conspired with the Ringleader Defendants, Zelyakovsky and Pashinsky to convert and/or steal the assets and property of Colonial utilized in its First Allied joint venture away from Plaintiffs and into the hands of the Ringleader Defendants in order to set up a new joint mortgage brokerage.

96.     Upon information and belief, the defendant THE ROSLYN SAVINGS BANK, A DIVISION OF NEW YORK COMMUNITY BANK (the " Roslyn Savings Bank") is a federally

chartered  and federally insured savings bank with a principal office at 1400 Old Northern

Boulevard, Roslyn (Nassau County), New York 11576 and offices for the regular transaction of

business in, *inter alia,* Nassau County, New York.

97.      Upon information and belief, Roslyn Savings Bank has conspired with and/or

enabled the Ringleader Defendants to embezzle or acquire funds belonging to LFH by allowing

them to deposit checks made payable to LFH into accounts owned by International.

98.      Upon information and belief, at all times hereinafter relevant, defendant

MULTIPLE LISTING SERVICE OF LONG ISLAND, INC. ("MLSLI") is a domestic

corporation with a principal place of business at 300 Sunrise Highway, West Babylon (Suffolk

County), New York, 11704.

99.      Upon information and belief, MLSLI has conspired with and/or enabled the

Ringleader Defendants to falsely, fraudulently, illegally and improperly transfer real estate

listings from LFH into the name of International.

100.     Upon information and belief, at all times hereinafter relevant, defendant

GREATER JERICHO CORP. ("Greater Jericho") was domestic corporation with offices located

at 333 Jericho Turnpike, Suite 226,  Jericho (Nassau County), New York 11753.

101.     Upon information and belief, Greater Jericho conspired with the Ringleader

Defendants, Zelyakovsky, Pashinsky and Quontic to convert and/or steal the assets and property

of Colonial utilized in its First Allied joint venture away from Plaintiffs and into the hands of the

Ringleader Defendants in order to set up a new joint mortgage brokerage.

102.     Upon information and belief, at all times hereinafter relevant, Defendant

WHERETOLIVE.COM INC., ("Wheretolive") was a Delaware corporation with a principal

place of business located at 7695 Anagram Drive, Eden Prairie (Hennepin County), Minnesota.

103.    Wheretolive is the internet 'host' for the laffey.com domain name and website, and the administrator for the laffey.com domain email system.

104.    Upon information and belief, Wheretolive has conspired with the Ringleader Defendants to deprive LFH from access to and control of its own email system, domain and website– a website that LFH has paid over ONE MILLION Dollars to develop, market and maintain.

105.    Upon information and belief, at all times hereinafter relevant , Defendant SIGNATURE PROPERTIES OF HUNTINGTON, LLC   a/k/a SIGNATURE PREMIER PROPERTIES ("Signature") is a domestic company with a principal office at 157 East Main Street, Huntington (Suffolk County), New York 11743 that is owned by Defendant Morris.

106.    Upon information and belief, Defendants Signature and Morris have conspired with the Ringleader Defendants to utilize the Ringleader Defendants' insider information as to employee and independent contractor agreements and income to lure agents, not otherwise targeted for International, away from LFH in order to diminish LFH's operations and value by taking its producers away.

107.    Upon information and belief, Defendant LINCOLN LAND SERVICES, LLC ("Lincoln") is a domestic limited liability corporation with a place of business at 324 South Service Road, Suite 302, Melville (Suffolk County), New York 11747. Lincoln is a title company that competes with eRealty.

108.    Upon information and belief, Lincoln and its principal, Hein, have conspired with the Ringleader Defendants to utilize inside information regarding eRealty in order to divert business from eRealty to his company, Defendant LINCOLN LAND SERVICES, LLC.

109.     Upon further information and belief, Lincoln, Hein and Defendant John Doe No. 1 have conspired with the Ringleader Defendants to further disrupt the legitimate business of eRealty by cutting its telephone lines in furtherance of the Defendants' scheme to convert money and other assets from Mark and Philip, LFH and the other Plaintiff entities, without their knowledge or consent, for the benefit of Defendants, and either to obtain complete control of LFH and the other Plaintiff entities and their revenues, or, in the alternative, to sufficiently devalue LFH and the other Plaintiff entities through the unlawful disruption and usurpation of LFH's and the other Plaintiff entities' business so that Defendants could purchase LFH's and the other Plaintiff entities' shares and/or assets at an artificially low price.

## II. FACTUAL BACKGROUND

110.     Defendant Emmett is the brother of Plaintiffs Mark and Philip. Together the three brothers are the owners of plaintiffs U.S. 1 LAFFEY REAL ESTATE CORP. d/b/a LAFFEY FINE HOMES, LAFFEY ASSOCIATES, LLC., eREALTY TITLE AGENCY CORP., TCG GROUP, INC., 55 NORTHERN BLVD., LLC, and GREENVALE COLONIAL HOUSE, LLC. (collectively, the "Family Entities" or "Plaintiff Entities").

111.     Each brother owns an equal one-third interest in the Family Entities.

112.     The family real estate business was founded in 1974 by Thomas Laffey, the father of Mark, Philip and Emmett. Originally focused on real estate sales, Thomas Laffey expanded the business, opening several offices and expanding the scope of the business to include real estate ownership and development.

113.     Sometime in or about 1991-1993, Thomas Laffey gave to these three of his children each an individual real estate office (Philip received NHP, Mark received Brookville and Emmett received WP).

20

114.     Subsequently, in or about 1995 – 1996, Thomas Laffey gave the remainder of the various real estate brokerage offices that he had started and built, to Emmett, Philip and Mark, in equal shares, as an outright gift.

115.     In addition, other businesses and properties owned in whole or in part by Thomas Laffey were given to his sons, including Philip, Mark, Emmett, non-party Brian Laffey and non-party Desmond Laffey, in equal shares.

116.     Through the years there have at times been disputes among the brothers.  For example, in or around 2008, the 5 brothers had a dispute regarding another family business that had been gifted to them, non-party 291 Uniondale Avenue LLC.

117.     That dispute was resolved via a 60-40 majority vote in favor of a course of action of which Emmett approved, over the objection of Mark and Philip.

118.     In other instances, actions were taken independently by one owner of the entity, without consent from his brothers.

119.     For example, Emmett, without authority or consent of Mark and Philip, unilaterally agreed to give an employee a $25,000 loan from LFH, supposedly to be secured by a mortgage on the employee's home; he neglected to perform a title search on the property to determine the validity or priority of any lien LFH might place on it to secure the loan.

120.     Mark, Philip and Emmett subsequently formed other entities, including TCG, Colonial, eRealty and others, to expand into other business areas. These entities were formed and owned jointly by the three of them.

121.     Emmett, prior to June 11, 2012, was an employee, officer and managing member and/or director of the Family Entities.

122. During the latter part of 2011 and the early part of 2012, it started to come to light that for years Emmett Laffey had been improperly diverting and using corporate assets of the Plaintiff Entities for his own benefit, has been improperly taking funds from at least one or more of the Plaintiff Entities, and has usurped corporate opportunities in contravention of his fiduciary duty as such employee, officer and managing member and/or director of the Plaintiff Entities.

123. On or about February 10, 2012, while employees and/or officers and/or managing members and/or directors at LFH and the Plaintiff Entities, the Ringleader Defendants formally established an unauthorized competing company known as "Laffey Fine Homes International LLC" ("International"), with a place of business located within the corporate headquarters of LFH at the Greenvale Premises.

124. Upon information and belief, while International purports to be a real estate agency and purports to be in the business of providing residential real estate brokerage and related services, for profit, it is merely a front for the Ringleader Defendants schemes to defraud Plaintiffs, banks and the general public and a vehicle for the Defendants and conspiring defendants to continue their fraudulent and illegal schemes.

125. When challenged by the legitimate owners, managers and directors of LFH and sensing that their ability to embezzle corporate funds, property and opportunities might be scrutinized thereby interfering with their scheme, the Ringleader Defendants became increasingly aggressive, bullying and threatening in their attempt to subvert and illegally seize control of LFH and the other Plaintiff Entities.

126. In response, the legitimate majority owners of the Plaintiff Entities recognized that the authority of the Ringleader Defendants had to be curtailed, their opportunity to conduct

their fraudulent schemes halted, and their ability to freely utilize the corporate treasuries as their personal piggy bank cut off.

127.     On Monday, June 11, 2012, at a validly held meeting of the shareholders of eRealty, which was attended by both Emmett and his attorney, and in accordance with the by-laws of eRealty, Philip and Mark, constituting a 2/3 majority vote of the shareholders, duly voted to terminate Emmett as a director of eRealty.

128.     On Monday, June 11, 2012, at a validly held meeting of the directors of eRealty, which was attended by both Emmett and his attorney, and in accordance with the by-laws of eRealty, Philip and Mark, constituting a 2/3 majority vote of the directors, duly voted to terminate Emmett as an officer of eRealty.

129.     On Monday, June 11, 2012, at a validly held meeting of the shareholders of LFH which was attended on behalf of Emmett by his private attorney and proxy, and in accordance with the by-laws of LFH, Philip and Mark, constituting a 2/3 majority vote of the shareholders, duly voted to terminate Emmett as a director of LFH.

130.     On Monday, June 11, 2012, at a validly held meeting of the directors of LFH, which was attended on behalf of Emmett by his private attorney and proxy, and in accordance with the by-laws of LFH, Philip and Mark, constituting a 2/3 majority vote of the directors, duly voted to terminate Emmett as an officer and employee of LFH.

131.     On Monday, June 11, 2012, at a validly held meeting of the members of Laffey Associates, which was attended on behalf of Emmett by his private attorney and proxy, and in accordance with the operating agreement of Laffey Associates, Philip and Mark, constituting a 2/3 majority vote of the members, duly voted to terminate Emmett as an operating manager of Laffey Associates.

132.    On Monday, June 11, 2012, at a validly held meeting of the members of 55 Northern, which was attended on behalf of Emmett by his private attorney and proxy, and in accordance with the operating agreement of 55 Northern, Philip and Mark, constituting a 2/3 majority vote of the members, duly voted to terminate Emmett as an operating manager and employee of 55 Northern.

133.    At no time have Plaintiffs sought to remove Emmett as a shareholder or member of any of the Plaintiff Entities.

134.    On or about June 11, 2012, the Directors of the Plaintiff Entities removed Emmett as a signatory on the accounts of the Plaintiffs at the Roslyn Savings Bank.

135.    As of Monday, June 11, 2012, Emmett Laffey was no longer an employee, officer and/or managing member and/or director of the Plaintiff Entities, although he was and still is a 1/3 owner of each of them.

136.    Despite having been duly and properly terminated as a director, officer, employee or operating manager, as the case may be, with respect to each Plaintiff, Emmett has expressed his intention to interfere, obstruct and harm the business and operations of the Plaintiffs.

137.    Despite his termination, Emmett has continued to use the administrative services (e.g., legal, accounting, marketing and advertising, etc.) provided by LFH to itself and the other Plaintiff Entities, for International, without payment to LFH for those services.

138.    Emmett, together with the other Ringleader Defendants and in concert with the Conspiring Individual Defendants, has continued to utilize the name, infrastructure and resources of LFH and the other Plaintiff Entities to solicit the highest producing agents of LFH to International, sometimes directing the transfer of their license to International without their knowledge or consent.

139.     Subsequent to his termination, Emmett held a "presentation" for high producing agents concerning "luxury" (i.e. – high priced) homes. Most of those invited to attend were either LFH's mangers, or were not even licensed sales people, just potential referral sources. The ***real*** purpose of the meeting was to tell the attendees to refer such high value listings outside of LFH to International. Despite this *ultra vires* purpose, Emmett attempted to charge the costs of the event to LFH.

### III. "LAFFEY FINE HOMES INTERNATIONAL LLC"

140.     On or about February 10, 2012, Defendant Conlon, while General Counsel of Plaintiff Laffey Fine Homes, at the unauthorized direction of Defendant Emmett, formed the defendant RICO enterprise "Laffey Fine Homes International LLC", utilizing resources of LFH as part of a scheme to convert money and other assets from LFH and the other Plaintiff Entities, Mark and Philip without their knowledge or consent, for the benefit of Defendants, and either to obtain complete control of LFH and the other Plaintiff Entities and their revenues, or, in the alternative, to sufficiently devalue the Plaintiff Entities through the unlawful disruption and usurpation of LFH's and the other Plaintiff Entities' business so that Defendants could purchase the Plaintiff Entities' shares and/or assets at an artificially low price

141.     The similarity of the name of the fraudulent enterprise was carefully selected to give the appearance that it was part of the Laffey family of businesses.

142.     So determined was Emmett to have International seem like a part of LFH, he even went so far as to characterize it in an email to LFH employees as a "branch office of LFH" and to invite LFH staff to "stop by and see all of your old friends"

143.     The Ringleader Defendants have utilized International to engage in a course of conduct designed to convert money and other assets from Mark and Philip, LFH and the other

Plaintiff entities, without their knowledge or consent, for the benefit of Defendants, and either to obtain complete control of LFH and the other Plaintiff entities and their revenues, or, in the alternative, to sufficiently devalue LFH and the other Plaintiff entities through the unlawful disruption and usurpation of LFH's and the other Plaintiff entities' business so that Defendants could purchase LFH's and the other Plaintiff entities' shares and/or assets at an artificially low price.

144.    Among the most egregious of the Ringleader Defendants' actions is when he used International and the similarity of its name to that of LFH to steal monies that belong to the Plaintiff Corporations.  On more than one occasion, the Ringleader Defendants have deposited or caused to be deposited checks, which were made out to one of the Plaintiff Entities, and deposited such monies into the account of International.  Despite the checks not being made out to International, the bank accepted the checks and posted the funds to International.

145.    The Ringleader Defendants have further used International as part of their scheme to defraud LFH by wrongfully transferring real estate listings from LFH to International without any authority to do so and have continuously recruited top agents from the Plaintiff Entities to work for International.

146.    The Ringleader Defendants have further used International as part of their scheme to defraud LFH by wrongfully transferring agents' Real Estate Licenses through the New York Department of State from LFH to International without any authority to do so, and they have continuously recruited top agents from the Plaintiff Entities to work for International.

147.    The Ringleader Defendants have International closely tied to the Plaintiff Entities by repeatedly, regularly, improperly and without authorization using Plaintiffs' property,

including offices, website, employees, funds, expertise, reputation, name, logo, and resources to steal the assets of LFH and the other Plaintiff Entities to 'build' International.

148.    The Ringleader Defendants have fraudulently attempted to claim that Philip and Mark consented to the raiding of LFH funds, resources and assets. Months after he incorporated International for Emmett, Conlon claims to have taken (and has produced before a court) copies of handwritten "notes" from an officers' meeting at LFH wherein he claimed such consent was given, despite the fact that such "consent" did not appear in any minute meetings.

149.    Such papers were never provided to Mark and or Philip but only to the Defendant.

150.    More shocking is the fact that such notes were not produced until after Conlon resigned as LFH's general counsel and had been escorted from the building. Such handwritten notes were purportedly in his personal possession and were not in LFH's corporate records or files.

151.    Moreover, such notes were provided to a party adverse to LFH's interests in flagrant disregard for his ethical obligations to his corporate client.

152.    Further, upon review of Conlon's company owned and provided computer, most documents and/or files have been deleted and or wiped clean prior to its surrender to LFH.

153.    Conlon's access to this computer was a highly contentious subject after he resigned in that Emmett insisted that he be given access to it.

154.    It seems likely that such access allowed Conlon and Emmett to cover up improper activities in conjunction with the Defendants.

## IV. The Scheme

155.     As the improper conduct and wicked aims of the Ringleader Defendants while employees and/or officers of LFH became evident, LFH terminated their employment in the case of some, while another, Ringleader Defendant Scott Conlon, resigned.

156.     However, even after their employment by LFH ended, the Ringleader Defendants falsely held themselves out to the public and others as *bona fide* LFH employees and agents with the purpose of interrupting LFH's and the other Plaintiff Entities' business and/or diverting LFH's and the other Plaintiff Entities' business to themselves. Ringleader Defendants to this day continue to intentionally create the false impression in the minds of the general public and of other employees of LFH and the other Plaintiff Entities, that they remain *bona fide* LFH employees.

157.     The ultimate goal of this illegal scheme is to convert money and other assets from Mark and Philip, LFH and the other Plaintiff entities, without their knowledge or consent, for the benefit of Defendants, and either to obtain complete control of LFH and the other Plaintiff entities and their revenues, or, in the alternative, to sufficiently devalue LFH and the other Plaintiff entities through the unlawful disruption and usurpation of LFH's and the other Plaintiff entities' business so that Defendants could purchase LFH's and the other Plaintiff entities' shares and/or assets at an artificially low price.

158.     In order to advance their goal, the Ringleader Defendants conspired with the Enterprise Defendants, Conspiring Individual Defendants and Conspiring Corporate Defendants to illegally utilize, convert and/or disrupt  LFH's assets and operations including, without limitation, agents, listings, employees, monies, brokerage commissions, trademarks, websites, domain names, computers, telephone systems, email, physical offices, office equipment and

28

furniture, copy machines, faxes, telephones, scanners, technology, supplies, advertising and marketing materials and methods, back office operations and more.

159.    The Defendants, while utilizing the United States mails, telephone lines, wires, emails and the internet for fraudulent and improper purposes, falsely held themselves out to the public and others as *bona fide* LFH employees and agents after their employment terminated in order to advance their scheme of misappropriating assets of LFH and its affiliated companies, including listings, agents, business opportunities and goodwill and commission checks to their own benefit.

160.    Some of the Ringleader Defendants have further resorted to physical violence and intimidating threats of further physical violence directed to the lawful employees and/or officers of LFH and the other Plaintiff Entities in furtherance of their schemes.

161.    They have also engaged in bank fraud and wire fraud in order to divert and/or convert checks and monies from LFH and the other Plaintiff Entities into their illegal enterprises.

162.    The scheme has included, without limitation: theft, conversion and/or usurpation of monies, real estate sales listings and commissions, brokers, internet domain names, email systems and websites; interference with employment or contractor relationships; interference with potential business relationships; attempts to sabotage the businesses and the growth of the businesses; misappropriation of trade secrets; improper competition using insider information and trade secrets; physical assaults and intimidation; implementation of intentionally lax controls and oversights; improper use, sequestration and diversion of corporate assets; usurpation of corporate opportunities; staging of misleading events; and other actions designed to enable them to defraud, divert and embezzle vast sums from LFH and the other Plaintiff Entities and utilize

LFH's and the other Plaintiff Entities' resources to create fraudulent competing entities building upon LFH's good name and reputation.

### A. Theft of Money

### i. Checks

163.    The Ringleader Defendants were responsible for the theft and misappropriation of numerous checks belonging to LFH.  Plaintiffs are presently aware of over ***Ninety Thousand Dollars*** worth of checks payable to LFH that were converted through fraudulent endorsements by the Ringleader Defendants and deposited into their accounts in a financial institution, Defendant Roslyn Savings Bank.

164.    The Defendants' Check fraud scheme involved the conversion of monies through fraudulent endorsements countenanced by or in concert with Roslyn Savings Bank.

165.    On or about October 3, 2012, a check payable to LFH, in the amount of $54,920.00, representing a sales commission due to LFH, was taken and converted by Emmett who deposited said check an account at the Roslyn Savings Bank into an account in the name of International.

166.    The Roslyn Savings Bank accepted that deposit and credited the check, in the amount of $54,920.00, to the account of International, notwithstanding that the check was payable to LFH, and not to International.

167.    Despite due demand therefor, Roslyn Savings Bank has failed and refused to credit that money to LFH, the entity to which the check was properly payable, instead leaving the money in the account of International.

168.     On or about Friday, September 21, 2012, a check was written to LFH in the amount of Twenty Thousand Seven Hundred Seventy Five Dollars ($20,775), representing the commission due to LFH on the sale of a property.

169.     Emmett took possession of that check and on Monday, September 24, 2012, took that check payable to LFH and attempted to deposit it in an account at the Roslyn Savings Bank in the name of International.

170.     The Roslyn Savings Bank accepted that deposit and credited the check, in the amount of $20,775, to the account of International, notwithstanding that the check was payable to LFH, and not to International.

171.     Despite due demand therefor, Roslyn Savings Bank has failed and refused to credit that money to LFH, the entity to which the check was properly payable, instead leaving the money in the account of International.

172.     Similarly, on or about September 28, 2012, a check payable to Laffey Fine Homes & Estates (a trade name of LFH), in the amount of $14,760.00, representing a sales commission due to LFH by reason of the efforts of NHP, was taken and converted by Emmett who deposited said check an account at the Roslyn Savings Bank into an account in the name of International.

173.     The Roslyn Savings Bank accepted that deposit and credited the check, in the amount of $14,760.00, to the account of International, notwithstanding that the check was payable to Laffey Fine Homes & Estates, and not to International.

174.     Despite due demand therefor, Roslyn Savings Bank has failed and refused to credit that money to LFH, the entity to which the check was properly payable, instead leaving the money in the account of International.

ii.   **Improper Payments**

175.     Unbeknownst to Mark and Philip, while Emmett was running back office operations for LFH and the other Plaintiff Entities, he began having checks cut to himself for things to which he was not entitled.

176.     Commencing in or around 2007 and continuing through 2011, Emmett would regularly take from the LFH corporate account, commissions on deals he claimed were his but to which he was not entitled.

177.     Annexed hereto as Exhibit A is a printout showing such payments to Emmett, in addition to regular distributions of profits and other legitimate payments.

178.     The items demarked with a dash are payments to Emmett without the knowledge, consent or agreement of Mark and Philip, taken by Emmett on his own and to which he was not entitled.

179.     These improper payments total *over Eight Hundred Thousand Dollars*.

iii.   **Commissions and Listings**

180.     The Ringleader Defendants through the RICO enterprise International conspired to steal real estate listings and commissions belonging to LFH in concert with the Conspiring Individual Defendants Brix, Babaev, Rogers, Mc Cray, Pimenta, Tubbs, DeClara, and Cerretta.

181.     The custom and practice in the industry, as well as the requirement of MLSLI, is that if a listing is taken while an agent/broker is associated with a particular brokerage, the listing is reported as belonging to that brokerage and stays so noted for the life of the listing, even if the broker/agent leaves that brokerage.

182.     Here, there were several listings taken while the Conspiring Individual Defendants Brix, Babaev, Rogers, Mc Cray, Tubbs, DeClara, and Cerretta were affiliated with

LFH that were subsequently, at their direction, transferred to International, or "corrected" to show International as the listing broker.

183.     This portion of the scheme relied upon, *inter alia*, fraudulent postings on the MLSLI website which was accomplished through the use of wire transmissions over the internet, and fraudulent emails representing that International (or brokers/agents affiliated with International) was the owner of listings, as well as check and bank fraud depositing checks belonging to LFH into the accounts of others, including International.

184.     In addition, MLSLI has allowed multiple listings of the same properties in their system, allowing entries for a listing with International on properties that their system already shows to be listed with LFH or one of its branch offices.

185.     Despite having these fraudulent listings and transmissions pointed out to them, MLSLI failed and refused to restore the listings to LFH as LFH rightfully demanded, instead allowing International and Emmett to receive commissions to which they were not entitled.

186.     In one transaction (573 Remsens Lane) that stands as an exemplar of the means in which the Ringleader Defendants conspired to defraud the Plaintiffs and general public, the Defendants stole funds approaching ***Two Hundred and Fifty Thousand Dollars*** from the Plaintiffs while, upon information and belief, at the same time cheating a client and another brokerage out of funds.

187.     Prior to the incorporation of the RICO enterprise International, LFH, through one of its agents obtained a property listing for premises located at 573 Remsens Lane, Upper Brookville (Nassau County), New York.

188.     The referral for the listing came from an agent from another brokerage in Palm Beach, Florida through the Leading Real Estate Companies of the World network, of which LFH is a member and, upon information and belief, International is not[1].

189.     The listing was secured by Defendant Babaev who was at the time an agent of LFH.

190.     Upon information and belief, the Ringleader Defendants, acting together with conspirators Babaev and MLSLI fraudulently changed the ownership of the listing from LFH to the RICO enterprise International by use of fraudulent wire transmissions and/or emails.

191.     The property located at 573 Remsens Lane in Upper Brookville was listed with LFH on or about November 22, 2010, prior to the formation or existence of Emmett's competing entity, International. At some point subsequent to the formation of International, in February of 2012, and unbeknownst to Mark or Philip, Emmett Laffey surreptitiously moved Babaev's license to International, and using transmissions over wires for interstate commerce, Emmett fraudulently changed or caused to be changed the ownership of the listing for the Remsens Lane property on the Multiple Listing Services database to International.

192.     The property was eventually sold, closing in May of 2012, for $3,925,000. The commission on this sale was 6%, or $235,500. Of course, despite LFH having expended money to advertise the listing, having its agents show the property multiple times, generally having worked the listing to generate the sale, as well as being the party that entered into the listing agreement with the seller, the commission was not deposited into LFH's accounts, instead being converted by the Ringleader Defendants.

---

[1] Nonetheless, International uses the Leading Real Estate Companies of the World logo in its marketing and promotional materials, trading on LFH's membership and dues.

193.     When questioned about the 'mistake' of depositing the money anywhere other than the LFH account, Emmett baldly and snidely replied in an email "Mistake? Why do you think it's a Mistake [sic]? Please explain in detail."

194.     The Ringleader Defendants also attempted to shortchange the referring broker in Palm Beach, Florida by mailing them a check for 25% referral fee instead of the 30% required through the terms of membership for a referral within the Leading Real Estate Companies of the World, through which this referral was secured. Upon information and belief, that check for the improper lesser amount was sent through the United States Mail from New York to Florida at the direction of the Ringleader Defendants on or about May 15, 2012.

195.     The title search and title insurance on that sale were done through Plaintiff eRealty, resulting in a fee to eRealty, net of underwriting fees, of $14,392. Emmett wrote himself a check from the eRealty account for that full amount. He was not entitled to do so. The funds belong to eRealty.

196.     In connection with that transaction alone, the Ringleader Defendants diverted $249,892, *__almost a quarter of a million dollars in corporate funds__*, to themselves.

197.     Moreover, Plaintiffs have subsequently received information[2] tending to show that Defendants failed to bring a *bona fide* and substantially higher, all cash offer to the Seller of the Remsens Lane property. That offer, in the amount of $4.1 million dollars was substantially higher than the selling price and would therefore have been to the benefit of the property seller; however it would have resulted in a lower commission to the conspiring Defendants. The offer that the selling client accepted for $3,925,000.00 was from a buyer for whom the Defendants would not have to split a commission. Had the client accepted the $4.1 million dollar offer, Defendants would have had to split the commission with another brokerage.

---

[2] Plaintiffs' information is verbal only but Plaintiffs continue to investigate and seek documentary proof.

198.     Upon information and belief, the sole purpose for Defendants' withholding the higher offer was to ensure that they received the higher commission.  Upon further information and belief, as a result of the Defendants' greedy self-serving and fraudulent conduct, the client was cheated out of ***One Hundred and Seventy Five Thousand*** Dollars in a higher sales price and another brokerage was cheated out of its share of a split commission.

199.     The Defendants in furtherance of their scheme, using the wires and internet, posted a fraudulent selling price online through the MLSLI of ***Four Million Dollars***, and not the actual selling price of $3,925,000 which upon information and belief was for the purpose of causing the defrauded broker and withheld offeror from questioning the failure of their higher offer to be accepted.

200.     Defendants have further conspired to defraud Plaintiffs and the general public by transferring multiple sale listings on the MLSLI records, from LFH to International or WP. A partial compendium of such lists is annexed hereto as Exhibit B.

201.     MLSLI has, despite due demand, failed and refused to transfer those listings back to LFH on its records.

202.     As a result, Plaintiffs and the general public are being misled as to the nature of those listings and Plaintiffs have been damaged.

**B. Enticement of Brokers**

203.     Since the formation of Enterprise Defendant International, the Ringleader Defendants have regularly and continuously contacted brokers and sales agents of LFH, attempting to convince them to leave their associations with LFH and instead come to work for International.

204.    Being in possession of proprietary information regarding the commission rates and compensation of the brokers and sales agents paid by LFH, Defendants have an unfair advantage in soliciting those employees and/or contractors.

205.    Many managers of the individual branch offices of LFH have complained verbally and in writing to Mark and Philip of the Ringleader Defendants' attempts to raid the brokers and sales agents from their offices and have stated that, as a result of Ringleader Defendants' actions they have been made to feel like they are in competition with one of the principals of LFH to recruit and maintain good brokers and sales agents for their offices.

206.    In addition to merely soliciting the services of those brokers and sales agents, the Ringleader Defendants, often in concert with the Conspiring Individual Defendants, have claimed to those brokers and sales agents that LFH is going out of business and have repeatedly made negative comments about LFH and Plaintiffs Mark and Philip, in an effort to have those brokers and sales agents move to International.

**C. Corporate Website, Domain and Email**

207.    In or around 2004 and prior, Mark, Philip and Emmett jointly desired to purchase the internet domain name Laffey.com in order to create a web presence to market and grow the business.

208.    The name was owned by an unrelated party, and negotiations were commenced for the purchase of the name. Negotiations were done by Mark and Emmett, for the purpose of securing the name for the benefit of the jointly owned business.

209.    Agreement was reached to purchase the domain name Laffey.com for the sum of $5,000.00.

210.    It was discovered in February, 2012 that Emmett had improperly registered the domain name Laffey.com to himself personally rather than to the jointly owned company.

211.    LFH has expended substantial financial resources and to date, continues to do so, to develop and maintain Laffey.com as the LFH corporate website.

212.    Upon information and belief, since the domain name was acquired, LFH's investment in Laffey.com has exceeded $1,000,000.00.

213.    However, despite the substantial financial resources expended by LFH to create, develop and maintain Laffey.com over the course of many years, Emmett incredulously contends that he solely owns it.

214.    This is despite the fact that Laffey.com as it exists today, would not exist, but for the substantial financial support provided by LFH towards its creation, development and maintenance.

215.    In fact, Laffey.com is not solely owned by Emmett but is a wholly owned corporate asset of LFH.

216.    On Monday, June 11, 2012, at a validly held meeting of the directors of LFH, it was resolved that LFH take all necessary measures to claim ownership of Laffey.com as a corporate asset.

217.    Despite multiple demands and submission of proof of the authority of Mark and Philip to act on behalf of LFH, Conspiring Corporate Defendant Wheretolive has repeatedly and unjustifiably failed and refused to grant Mark or Philip administrator status to the email system, website or domain, instead insisting that they will only follow instructions from Emmett.

218.     Wheretolive will not allow Mark or Philip to add, modify or delete content on the website, modify lists, perform any administrator tasks or perform any other tasks with respect to the website or email system.

219.     The laffey.com domain is hosted by wheretolive.com.

220.     Emmett is currently the administrator for Laffey.com and wrongfully limits any access to it by Philip and Mark.

221.     Emmett, as the administrator of the website and domain, is wrongfully exercising control over LFH's corporate asset.

222.     Defendant Wheretolive is being complicit in this wrongful control refusing to allow Mark or Philip administrator status and instead following only instructions from Emmett.

223.     The Laffey.com website has a section that conveys information to interested parties concerning new real estate developments/neighborhoods/etc. To access that section, a visitor to the site would click on a link labeled "Long Island Developments" from any of several places on the Laffey.com site.

224.     However, Emmett Laffey redirected that link from all the pages so that a visitor clicking on it would be taken to a different website, laffeynewdevelopments.com that, instead of providing information for the benefit of any of the Plaintiff Entities, instead solicited business solely for Emmett Laffey's competing entity, Defendant International.

225.     The people and properties mentioned throughout those pages are employees or agents of, and sales of the listings on those pages through them would inure to the benefit of, Emmett's competing business, Defendant International.

226.     When challenged upon the institution of a lawsuit in the New York State Supreme Court, Nassau County,  Emmett attempted to cover-up his diversions and changed the link to point instead to a section of the Laffey.com website, albeit one with very little information.

227.     Defendants had also created an additional domain called "luxurylaffey.com".  A "whois" search reveals that domain is registered through an anonymous agent, and the owner's name is not available. The domain is not currently active, however, visiting that domain previously took you to the page, on the Laffey.com site, of Conspiring Individual Defendant Rogers.

228.     The links from Rogers' page all pointed towards other pages on the Laffey.com site. Upon information and belief, Defendants either own this domain or were complicit in allowing the Laffey name and reputation to be used in this context, without the agreement of Philip or Mark.

229.     The Defendants have also continued to use Laffey.com to falsely hold out that they are still employed by or associated with LFH and continue to do so into the present.

### C. Internal Computer Systems

230.     In another tactic of extreme coercion, on or about November 1, 2012, the Ringleader Defendants changed the passwords to LFH's computer systems and locked LFH's legitimate employees even including Mark and Philip, from using the system.  The Ringleader Defendants attempted to use their temporary control of the passwords to extort concessions from LFH and the other Plaintiff Entities.

231.     For nearly a month, until computer experts could break the encoded passwords, LFH and the other Plaintiff Entities were unable to access their own proprietary computer and accounting systems.

232.     During this time, <u>all</u> accounting was done by hand, all checks (well over 100) were written and recorded by hand, agents and vendors received checks later than the normal course of business, and the business was entirely disrupted.

233.     Also during this time, the Ringleader Defendants were telling LFH's vendors and agents that LFH couldn't pay its bills and was going out of business, despite the fact that LFH was, is and has always been profitable and solvent, with more than sufficient cash on hand to pay all its bills.

234.     The Ringleader Defendants unlawful conversion of the LFH computer system was taken in furtherance of their ultimate goal of converting revenue and profits from LFH and the other Plaintiff Entities and disrupting the legitimate business of LFH and the other Plaintiff Entities so that they could take over their assets.

**D. Interference with business relationships and potential business relationships**

**i.   Citibank**

235.     Plaintiff Colonial owns 49.9% of First Allied, a joint venture with Wells Fargo, who owns the remaining 50.1%. First Allied was a mortgage company, which had the advantage of getting leads for prospective mortgage customers from LFH and its agents and employees.

236.     In mid-2012, Wells Fargo announced its intention to wind down that joint venture as of December 31, 2012.

237.     Because the synergy between a real estate brokerage and a mortgage company created the opportunity for a very financially attractive relationship, Mark and Philip sought to find a new bank with which to partner to continue the business developed by First Allied.

238.     Mark and Philip had discussions with, among others, Citibank ("Citi") and Chase. In December, of 2012, a tentative agreement for a marketing relationship between Citi and LFH

was close to being reached. The relationship was to being January 1, 2013, immediately upon the cessation of the Wells Fargo joint venture, which would maximize the retention of the value of LFH and Colonial's mortgage business.

239. Such an agreement would have inured to the benefit of LFH, an entity jointly owned by Mark, Philip and Emmett.

240. The Enterprise Defendants, using Emmett's private attorney, contacted Citi and threatened to bring them into litigation if they reached an agreement with LFH without Emmett's explicit consent.

241. At the same time, the Ringleader Defendants were forging a similar relationship with Conspiring Corporate Defendant Quontic Bank, solely for the benefit of the Enterprise Defendant International and the Ringleader Defendants.

242. As a result of the threats by Emmett and the Ringleader Defendants, fearing extensive litigation Citi abruptly ended discussions with Mark and Philip.

243. As a further result, without a mortgage lender to continue the business upon the cessation of the Wells Fargo joint venture, the profitable mortgage business of LFH and Colonial evaporated on January 1, 2013.

244. Neither Mark, Philip and Emmett jointly, nor LFH, any longer enjoy the income stream generated by First Allied or that would have been generated by the potential marketing agreement with Citi.

**ii.   Jon Evans**

245. Defendants have further interfered with the operations of LFH and the other Plaintiff Entities by cutting off the authorized email accounts of LFH employees and independent contractors.

246.    By way of example, Jon Evans ("Evans") is an independent contractor and vendor of LFH. Evans provided services to First Allied, one of LFH's affiliated companies, for which LFH compensated Evans and his assistant.  LFH was, in turn, reimbursed for that compensation by First Allied,  in which Mark, Philip and Emmett each have an equal interest.

247.    Evans and his assistant provided marketing services and lead generation for that company, using, among other things, Laffey.com data and email addresses, and using other electronic resources of LFH and affiliated companies.

248.    Despite his having been removed as an officer, employee and director of LFH, and having no authority to do so, on or about September 4, 2012,  Emmett purported to terminate the services of Evans and his assistant as part of his attempt to interfere with LFH's business operations.

249.    Emmett also interfered with Evan's ability to perform services for LFH and the mortgage company, First Allied.  For example, Emmett cut off access to the Laffey.com domain emails of Evans and his assistant, making it impossible for Evans to effectively provide services to LFH and First Allied.

250.    Despite multiple demands and submission of proof of the authority of Mark and Philip to act on behalf of LFH, Conspiring Corporate Defendant Wheretolive failed and refused to restore Evans' email and that of his assistant on the instructions of Mark or Philip, instead insisting that they will only follow instructions from Emmett.

251.    On or about September 13, 2012 at approximately 2 p.m., Emmett, using telephone lines and wires to perpetrate a fraud, placed a call to Jon Evans: During that call, Emmett began to attack Evans verbally. Without authority from LFH or Colonial, Emmett

fraudulently held himself out to Evans that he had authority to terminate his contracts and told Evans to take his things and "get the fuck out."

252.    Upon information and belief, on or about September 13, 2012 and September 14, 2012, Emmett placed or caused to be various phone calls to LFH's branch managers fraudulently advising them that Evans' services had been terminated and they were not to provide him with information or to speak with him. Such representations were false and such directions were without authority from LFH. Upon further information and belief, the purpose of such calls was to interfere with and interrupt LFH's business operations in furtherance of the RICO scheme.

253.    On or about September 25, 2012, without authority from LFH, Emmett sent an email using LFH's company email over the wires wherein he wrote:

"Mr Evans, I notified you personally on Sept 4th that your services were no longer required and that Complete Home Buyer was being removed as a vendor from Laffey Fine Homes. In addition, you are not employed by Laffey Fine Homes or First Allied Home Mortgage… This matter is now being handed over to my attorney and the proper authorities. Please be guided accordingly."

### iii.    DeNoyior/Huntington/E. Northport

254.    On or about September 2012, LFH determined to further expand its businesses to the benefit of ALL of its shareholders by the purchase of a real estate firm, Suzanne S. DeNoyior Realty Inc. d/b/a C21 Northern Shores ("DeNoyior"), located in Northport(Suffolk County), New York.

255.    DeNoyior was also in the process of opening a second office in Huntington, NY, having secured a space, planned the build-out, etc.

256.    Defendant Conlon, who was still general counsel to LFH at the time, was handling the acquisition on behalf of LFH.

257.    Upon information and belief, Conlon was surreptitiously funneling information to Emmett, who was no longer an employee or officer of LFH, about the proposed purchase, in breach of Conlon's obligations to LFH.

258.    Upon further information and belief, such purchase was deemed by the Ringleader Defendants to be a threat upon their scheme to devalue or seize control of LFH, which was about to expand again, or to their plan to open their own competing office in the area and divert revenue and profit from LFH to the benefit of International and the Ringleader Defendants.

259.    On September 18, 2012 at 12:54 p.m., Emmett caused a letter to be sent through electronic wires to counsel for DeNoyior seeking to scare them off from going forward with the transaction with LFH. Upon information and belief, this letter was sent as part of Defendants' unlawful scheme to convert money and other assets from Mark and Philip, LFH and the other Plaintiff entities, without their knowledge or consent, for the benefit of Defendants, and either to obtain complete control of LFH and the other Plaintiff entities and their revenues, or, in the alternative, to sufficiently devalue LFH and the other Plaintiff entities through the unlawful disruption and usurpation of LFH's and the other Plaintiff entities' business so that Defendants could purchase LFH's and the other Plaintiff entities' shares and/or assets at an artificially low price.

260.    On September 18, 2012, at 2:05 p.m. counsel for DeNoyior sent an email to Conlon at LFH seeking an explanation for the letter he had received on behalf of Emmett.

261.    Conlon withheld the fact of the email letters from Mark and Philip.

262.    Two days later, on September 20, 2012, Mark received a call from Suzanne DeNoyior, the owner of the DeNoyior office, bringing those email letters to his attention.

263.     Mark confronted Conlon who only then provided copies of those email letters to Mark.

264.     Upon information and belief, such withholding was done as part and parcel of the scheme to illegally disrupt LFH's business at the direction of or in concert with the other Ringleader Defendants.

265.     The Ringleader Defendants' attempts to scare DeNoyior away from the deal were not successful and LFH purchased DeNoyior.

266.     LFH subsequently followed through on the planned opening of the Huntington office.

267.     The benefits from the purchase of DeNoyior's office, as well as the opening of the Huntington office, inured and continue to inure to the benefit of all the shareholders of LFH.

**E. Sabotage of businesses**

**i.  Mortgage business**

268.     On or about July 2012, the Ringleader Defendants in concert with Pashinsky and Zelyakovsky became aware that Wells Fargo was terminating its joint ventures with third party realty companies regarding the writing of mortgages in New York State.

269.     Pashinsky and Zelyakovsky were employees of First Allied, a joint venture between Colonial (one of the Laffey Family Businesses) and Wells Fargo.

270.     Mark and Philip have a two-thirds ownership interest in Colonial (Emmett owns the other one-third). Colonial owns 49.9% of First Allied. Wells Fargo owns 50.1% of First Allied.

271.     Over the years, Emmett has attempted to keep Mark and Philip in the dark about goings on at First Allied and has sent them threatening emails to "stay away" from the business.

An email dated April 18, 2012 sent by Emmett at 2:29 p.m. confirms this fact. Emmett wrote to Mark, who at the time was a member of the Operating Committee of First Allied: "I have told you multiple times to stay away from this company. You are not a member of the OC[3]. You have had zero contributions to FAHM..."

272.     With the assistance of Conlon, Emmett shockingly hid from Mark and Philip the fact that he, along with First Allied,  LFH, Laffey Associates, Colonial, and Wells Fargo had become the subject of a federal class action lawsuit alleging improper practices at First Allied, including *inter alia* Conspiracy, Violations of RESPA and Violations of NY GBL § 349.

273.     On or about December 31, 2012, the operations of First Allied were scheduled to cease at the direction of Wells Fargo.

274.     The offices of First Allied were located on the 2nd floor at 333 Jericho Turnpike, Jericho (Nassau County), New York.  eRealty at the time was located on the 3rd floor of that building and the two entities shared a common phone system.

275.     Recognizing an opportunity to steal the mortgage business of Colonial upon the termination of the First Allied joint venture, the Ringleader Defendants conspired with Pashinsky, Zelyakovsky, Quontic Bank, Greater Jericho and John Doe No. 1 to illegally take control of the mortgage business.

276.     When First Allied's lease at 333 Jericho Turnpike expired on December 31, 2012, as is more fully set forth below, Conspiring Corporate Defendant Quontic Bank leased the space, upon information and belief, with the knowledge and cooperation, and through the coordination of Emmett.

---

[3] Operating Committee

277.     All the furniture, fixtures, computers and telephone equipment, which had been used by First Allied, were provided by Colonial and remain the property of Colonial.

278.     Quontic Bank is using the space as a mortgage origination and/or processing office, the same business for which the space had been leased by First Allied.

279.     The furniture, fixtures, computer and telephone equipment were left in the premises for the use of Quontic Bank, upon information and belief through the acquiescence and coordination of Emmett and wholly without the knowledge or consent of Plaintiffs.

280.     This illegal conversion of Colonial's equipment inures to the benefit of the Ringleader Defendants and the Enterprise Defendants, again an example of Emmett breaking his fiduciary responsibility to a Company (Colonial) in which he participates equally along with Mark and Philip, instead acting for his sole benefit.

281.     The landlord of the space at 333 Jericho Turnpike was and is Conspiring Corporate Defendant Greater Jericho Corp.

282.     When requested to do so, Greater Jericho Corp. refused to grant Mark or any other representative of eRealty or First Allied or Colonial access to the First Allied space on the 2nd floor to allow recovery of the furniture, fixtures and equipment belonging to Colonial.

283.     On or before January 1, 2013, Quontic entered into an agreement with one or more of the Ringleader Defendants and/or Enterprise Defendants to create a joint venture mortgage company or establish some similar relationship, in the place of that between Colonial and Wells Fargo. In furtherance of this scheme, Quontic 'hired' Pashinsky and Zelyakovsky to act as 'mortgage brokers' for the company.

284.     In furtherance of this enterprise, Quontic took a lease on the First Allied space in 333 Jericho Turnpike effective January 1, 2013 and changed the locks.   At the time Quontic

48

took 'possession' of the premises, with the assistance of the Ringleader Defendants, Pashinsky and Zelyakovsky, all of First Allied's furnishings, equipment, modems, phone system and telephones, desks, files and property were in the space.

285.     In collusion with Quontic, Zelyakovsky, Pashinsky, and Greater Jericho, the Ringleader Defendants declared such property to be "abandoned" and seized it for their own use. Such parties had no right to declare such property abandoned since it was the property contributed to the First Allied Joint Venture by Colonial and was to return to Colonial upon the cessation of the joint venture.

286.     Plaintiffs were unaware of this change until there was problem with eRealty's phone and internet access when John Doe No. 1, upon information and belief at the direction of the Ringleader Defendants, cut the phone lines to eRealty's offices on the floor above and left them without service.

287.     When agents from Colonial came to gain access during the beginning of January 2013, to the space to perform maintenance on the phone system in that 2nd floor space, and to inventory the furniture, fixtures, equipment and any other assets of First Allied/Colonial remaining in the space so that arrangements could be made to recover same, they were denied access.

288.     Representatives of Greater Jericho advised that Colonial not be given access because the space had been leased to Quontic Bank, which is the entity with whom Emmett Laffey, who owns the other 1/3 of Greenvale Colonial House, has, upon information and belief, unilaterally contracted to create or maintain a mortgage business similar to that engaged in by First Allied.

289.     As is more fully set forth below, a representative of Quontic Bank advised that it was Emmett, specifically, who on behalf of Quontic Bank, directed that Colonial and eRealty representatives not be given access to the space and be directed to leave at once.

290.     Upon information and belief, as a result of this conspiracy among the Ringleader Defendants, Quontic, Greater Jericho, Pashinsky and Zelyakovsky, it appears that this new mortgage business will run using the furniture, fixtures, equipment, modems, phone system and telephones, etc. owned by Colonial.

291.     Requests for access to the space were and have been continually denied.

**ii.    eRealty**

292.     As stated above, eRealty had been leasing space in the same building at 333 Jericho Turnpike, one floor above the space leased by First Allied, and had been sharing the telephone system with them, as well as sharing an internet connection.

293.     On January 7, 2013, eRealty experienced an interruption in its telephone and internet service, including its email.

294.     After several hours of going through internal channels to seek a remedy for the phone, internet and email outage, eRealty received a call from Emmett who told them he would have the problem fixed.

295.     Emmett previously had little or nothing to do with the operation of eRealty.

296.     On January 9, 2013, eRealty again experienced an interruption in its telephone, email and internet service.

297.     An employee of eRealty went downstairs to the First Allied space to attempt to have the phone, email and internet system rebooted. Upon arriving, she found two people in the

50

space who claimed to work for Quontic Bank. They were in the process of, among other things, dismantling the phone and internet (including email) system.

298.     She asked them to restore the service for eRealty, and they refused, stating that Quontic was now the occupant and that they would not restore the service for eRealty.

299.     They stated to her that Emmett told them to pull out the phone system and that he did not care if it put eRealty out of business.

300.     A gentleman named Darren Costa, who previously had been an employee of First Allied and is now apparently affiliated with Quontic Bank, was also there. After a short time he told the eRealty employee that she had to leave because she was not affiliated with Quontic Bank. He told her that Emmett instructed him to so inform her.

301.     When eRealty was finally able to get Emmett to agree to let their tech support people in to restore service, those tech support people found that the wires that carried the communications service from the main system unit in the former First Allied space on the 2nd floor up to the eRealty space on the third floor, were physically cut.

302.     Greater Jericho, the landlord of the building, refused to cooperate with Mark or any representative of eRealty, LFH or Colonial in their efforts to fix the service or recover the equipment, furniture or fixtures, instead cooperating solely with Emmett, who was acting on behalf of himself, International and Quontic Bank, but **_not_** on behalf of LFH, eRealty or Colonial.

### iii.    **Huntington and East Northport Offices**

303.     As specified above, in November 2012, despite the attempts of Ringleader Defendants to sabotage the transaction, LFH purchased the DeNoyior office in Northport and opened another in Huntington.

51

304.     Upon information and belief, in retaliation for having thwarted their attempts to prevent the DeNoyior purchase, the Ringleader Defendants entered into an agreement with Defendants Morris and Signature to provide Morris and Signature with inside information acquired by Conlon when he was general counsel to LFH.  The purpose behind this conspiracy was to enable Morris and Signature, both of whom are Huntington area realtors and personal friends of Emmett and Karen, to steal agents away from the new LFH Huntington office in an attempt to further disrupt and diminish the legitimate business of LFH, reduce the profits of LFH and enable International to open its own offices in the area after drastically reducing the ability of LFH to compete.

305.     Subsequently, several of the brokers and sales agents in those two offices have received communications from Conspiring Individual Defendant Peter Morris, on behalf of Conspiring Corporate Defendant Signature Properties of Huntington, LLC, attempting to recruit those brokers and sales agents to leave the employ of, or association with, LFH and move to Signature.

306.     Morris has claimed that Emmett instructed him to solicit all the brokers and sales agents from those offices because Emmett wants those offices, owned by LFH and therefore equally by Emmett, Mark and Philip, to go out of business.

307.     Upon information and belief, Emmett would then try to acquire or enter into a transaction with Signature and/or Morris.

**F. Trade Secrets**

308.     By virtue of his position as a shareholder, officer, director and employee of LFH and the other Plaintiff Entities, Emmett was privy to various trade secrets and proprietary information.

309.    By virtue of their positions as executive employees of LFH, the remaining Ringleader Defendants were also privy to various trade secrets and proprietary information.

310.    The trade secrets and proprietary information included, *inter alia,* marketing techniques, salary and commission structures, source and referral databases, sales leads, etc.

311.    Ringleader Defendants are now operating Enterprise Defendant International, improperly using those trade secrets and proprietary information.

312.    Various leads generated while Ringleader Defendants were at LFH have suddenly come to fruition at International and WP once the Ringleader Defendants left LFH.

313.    By way of example, Berkowitz, the brother of Emmett's wife Karen, was formerly an executive at LFH having the position of Regional Sales Director. During his employment at LFH, Berkowitz had access to certain confidential information of LFH, including, without limitation, lists of agents, employees and independent contractors, lists of leads and customers, salary and commission information, operations, marketing strategies, financial information, pricing information, and other data.

314.    While employed at LFH, Berkowitz solicited real estate listings from the public which he then hid from LFH by "parking" the listings in the name of Individual Conspiring Defendant Pimenta, another agent at Emmett's solely owned office, Defendant WP, with Pimenta's full knowledge, consent, cooperation and involvement.

315.    While employed by LFH, generally with Pimenta's cooperation and involvement as manager of WP, Berkowitz moved all or substantially all of his listings from the Syosset branch office of LFH (owned jointly by Emmett, Mark and Philip) to Defendant WP (owned solely by Emmett).

316.     Upon his leaving LFH and joining International, those "parked" listings were transferred to Berkowitz' name and license at International.

317.     Schoonmaker, a personal friend of Emmett and his wife Karen, was recruited by Emmett into LFH as a Senior Vice President with the purported purpose of acting as an agent recruiter for LFH.  However, Schoonmaker, one of LFH's highest paid employees, had access to certain confidential information of LFH, including, without limitation, lists of agents, employees and independent contractors, lists of leads and customers, salary and commission information, operations, marketing strategies, financial information, pricing information, and other data.

318.     Schoonmaker used his position of trust within LFH, as well as LFH's resources, to steer potential star agent recruits to Emmett's own personal entities including International and WP, and away from LFH.

319.     Conlon was formerly employed as General Counsel to LFH until 2012. He resigned his position on October 5, 2012 when it became apparent that he was acting as an inside man funneling information and documents to the other Ringleader Defendants while continuing to perform services for Emmett personally as well as for the Enterprise Defendants, in each case in defiance of corporate resolutions and directions that he not do so,

320.     In addition, the Ringleader Defendants, trading on their inside knowledge of commission structures and sales leads, have been soliciting and enticing the top producers of LFH to leave LFH and move to International.

**G. Improper Competition**

**i.    Real Estate Brokerage Services**

321.     In or about January, 2012, Enterprise Defendant International was formed by Ringleader Defendant Conlon at the instruction of Ringleader Defendant Emmett.

322.   Upon information and belief Emmett is the sole owner of International, which is in the business of real estate sales brokerage service, for profit, in direct competition with LFH.

323.   Although Emmett, Mark and Philip each had an individually owned real estate brokerage office, they were geographically diverse from the real estate brokerage offices owned jointly under the LFH name.

324.   Each of those offices had been given to them years before.

325.   Thomas Laffey gave them each a 1/3 interest in each of the remaining Family Businesses.

326.   Mark's solely owned office is in East Norwich, Philip's solely owned office is in New Hyde Park and Emmett's solely owned office is in Williston Park. LFH does not have offices in any of those service locations.

327.   LFH's headquarters is at 55 Northern Boulevard in Greenvale.  The back office functions are performed on the second floor there. There are brokerage services performed on the first floor and part of the second floor there by LFH employees and agents.

328.   LFH has its Greenvale I and Greenvale II offices, among the largest branches within LFH, at that location.

329.   When International, Emmett's second solely owned brokerage entity, was formed, it began operating out of the LFH headquarters on the second floor at 55 Northern Boulevard in Greenvale, incredibly, competing directly with LFH's Greenvale I and Greenvale II brokerage offices in the same location.

330.   Any income generated by International accrued to the sole benefit of Emmett, while any income generated by Greenvale I or Greenvale II was for the equal benefit of Emmett, Philip and Mark.

331.    As alleged above, various sales leads generated by LFH and known to Ringleader Defendants through their employment and affiliation with LFH, were taken from LFH and parked in WP or directly given to International, to the detriment of Mark, Philip and LFH.

**ii.  Title Agency**

332.    In addition, Plaintiff eRealty is a title insurance agency. It is, like LFH, jointly owned by Emmett, Mark and Philip.

333.    For over a decade, eRealty has developed a proprietary and highly valuable client list which includes certain attorneys and others that regularly place their title search and title insurance orders with eRealty.

334.    Upon information and belief, the Ringleader Defendants have established a relationship with Conspiring Corporate Defendant Lincoln Land Services, LLC, which is owned in part by Conspiring Individual Defendant Christopher Hein.

335.    Upon further information and belief, Hein's wife Joie Marie Hein is a personal friend of Conspiring Individual Defendant Karen Berkowitz Laffey, the wife of Ringleader Defendant Emmett Laffey.

336.    Upon information and belief, Hein and Lincoln have conspired with the Ringleader Defendants and the Individual Conspiring Defendants to improperly utilize insider, confidential and proprietary information regarding eRealty to divert business from eRealty to Hein's company, Defendant Lincoln, LLC.

337.    The insider, proprietary and confidential information so utilized includes but is not limited to client lists, leads, referral sources, etc.

338.     For example, Emmett has demanded that he be sent an email each night of the "Application Book", a business record of eRealty in which eRealty tracks of all the title searches and insurance ordered by its clients.

339.     Emmett has used and continues to use that information to learn of the clients of eRealty.

340.     He then, along with Ringleader Defendants Berkowitz and Schoonmaker, contacts those clients, telling them that eRealty is going out of business, and improperly diverting the clients of eRealty to Lincoln.

341.     Further, upon information and belief, Individual Conspiring Defendant Elaine Lupo, who was an employee of eRealty until her resignation on January 18, 2013, had been improperly forwarding confidential information of eRealty to the Ringleader Defendants.

342.     On or before January 24, 2013, Berkowitz and Schoonmaker met with another employee of eRealty in an attempt to get her to leave the employ of eRealty.

343.     At that meeting they informed her they, along with Emmett, had access to all the records of eRealty,  that eRealty was going out of business, that they knew all the financial circumstances of eRealty, knew all the clients of eRealty, and that they had been contacting the clients of eRealty to take their business away from eRealty.

344.     Further, they told this eRealty employee that Emmett controlled all the computer systems of LFH and the other Plaintiff Entities and that they were taking all of the leads generated by LFH to benefit the Defendants alone.

345.     Upon information and belief, all that information and access was supplied by Conspiring Individual Defendant Lupo.

346.     In addition, Ringleader Defendants and Conspiring Individual Defendants have been falsely telling eRealty employees and agents that eRealty is going out of business, thus materially interfering with the operation of eRealty.

347.     By virtue of his position as one of the owners of eRealty, information coming from, or seeming to come from, Emmett seems inherently more credible than normal industry gossip. Therefore, negative comments that come from Emmett, or appear to come from Emmett by virtue of coming from one of his personal employees or insiders, have a damaging effect on morale, operations and the general conduct of business of eRealty.

348.     Similarly, by virtue of his position as one of the owners of LFH and the other Plaintiff Entities, information coming from Emmett, or appearing to come from Emmett by virtue of coming from one of his personal employees or insiders, seems inherently more credible than normal industry gossip. Therefore, negative comments that come from Emmett, or appear to come from Emmett by virtue of coming from one of his personal employees or insiders, have a damaging effect on morale, operations and the general conduct of business of LFH and the other Plaintiff Entities.

### iii.   Mortgage Business

349.     As stated above, on or before January 1, 2013, Quontic entered into an agreement with one or more of the Ringleader Defendants and/or Enterprise Defendants to create a joint venture mortgage company or establish some similar relationship, in the place of that between Colonial and Wells Fargo. In furtherance of this scheme, Quontic 'hired' Pashinsky and Zelyakovsky to act as 'mortgage brokers' for the company.

350.     Also as stated above, in furtherance of this enterprise, Quontic took a lease on the First Allied space in 333 Jericho Turnpike effective January 1, 2013 and changed the locks.   At

the time Quontic took 'possession' of the premises, with the assistance of the Ringleader Defendants, Pashinsky and Zelyakovsky, all of First Allied's furnishings, equipment, modems, phone system and telephones, desks, files and property were in the space.

351.     As alleged, in collusion with Quontic, Zelyakovsky, Pashinsky, and Greater Jericho, the Ringleader Defendants declared such property to be "abandoned" and seized it for their own use. Such parties had no right to declare such property abandoned since it was the property contributed to the First Allied Joint Venture by Colonial and was to return to Colonial upon the cessation of the joint venture.

352.     Ringleader Defendants, in concert with Defendants Quontic, Pashinsky and Zelyakovsky continue to contact office managers, brokers and sales agents of LFH, soliciting referrals for mortgage business.

353.     Those solicitations are designed to and in fact do defraud the managers, brokers and agents into believing that the referrals will inure to the benefit of the Plaintiff Entities, that it is "business as usual" as Emmett says, and fails to disclose that the referrals inure solely to the benefit of various Defendants.

354.     Access to the LFH network of managers, brokers and agents, including their names, contact information, status of their listings and transactions, etc., is gained only as a result of the misuse of the insider, confidential and proprietary information developed and maintained by LFH and the other Plaintiff Entities.

355.     By damaging the business or operation of LFH or of eRealty, the Ringleader Defendants gain an unfair competitive edge for International, for Hein and for Lincoln and for Quontic.

### H. Physical Assaults and Intimidation

356.    In furtherance of their nefarious schemes, the Ringleader Defendants have attempted to physically intimidate or assault a number of LFH employees at various times and locations.

357.    Specifically, on December 6, 2012, at 215 Main Street, Port Washington (Nassau County), New York, Defendants Schoonmaker and Berkowitz attempted to strong arm their way into an LFH office after having been advised that their presence was unwelcome.

358.    During the attempt Berkowitz physically assaulted Mark Laffey and had to be removed from the premises by the Port Washington Police Department.

359.    Mark Laffey filed a police report regarding the incident with that Port Washington Police Department.

360.    Schoonmaker, Berkowitz and/or Emmett, either singly, all together or in varied combinations, attempted to gain access to a number of LFH branch offices during November and December 2012 with the purpose of threatening, harassing or intimidating LFH's employees and agents with the intent of either interfering with their ability to perform their duties or to coerce them into leaving LFH and joining International.

361.    On December 10, 2012, one of LFH's branch managers wrote to the LFH corporate office regarding the Defendants pugnacious tactics, stating:

> This has gotten way out of control! My front desk and I are now working in fear. This is having a devastating effect on all my agents, staff and me!!!
> I pray no one harasses me or attempts to provoke me into any physical action!

362.    On December 3, 2012, at 20 Miller Place, Syosset (Nassau County), New York 11791, Berkowitz entered a branch office of LFH and began harassing the secretary and made threats about "crashing" and disturbing the office's holiday party.

363.     On or about June 2012, at the Greenvale Premises, Defendant Emmett physically assaulted Philip and pushed him into a desk when Philip would not sign a check for Emmett's fraudulent claims for "reimbursement" of expenses for non-company related charges.

364.     Although initially reluctant to file charges against a family member, Philip ultimately recognized the necessity of filing a police report with the local precinct to prevent future violence in the Greenvale Premises.

365.     On April 18, 2012, at 1:54 p.m., before he was removed as a director and officer, Emmett Laffey, using LFH's email, sent a threatening email over the wires which was received by Philip and to Mark intimating a potential physical assault with the 'subtle finesse' of a schoolyard bully: Emmett wrote: "Coward, and I mean both of you, but especially you Mark you shameless coward. You stupid coward. I will meet you both face to face today. Tell me where and when. I am waiting coward."

366.     On September 25, 2012, Emmett got into a verbal altercation with LFH vendor Jon Evans at the Greenvale Premises wherein Emmett told Evans to "step outside so we can settle this right now", inviting him to escalate the dispute into a physical altercation. Upon information and belief, the purpose behind Emmett's actions was to further disrupt the operations of LFH and the other Plaintiff Entities.

367.     On September 28, 2012, at 12:18 p.m., Conlon, in an surreptitious attempt to keep non-party Brian Laffey (another brother of Mark, Philip and Emmett, who does not have an ownership interest in the Family Business) from working at LFH, sent the following email, upon information and belief at the behest of Emmett and the other Ringleader Defendants to convey their threat of employing armed "guards" in the Greenvale Premises:

"As all of you are aware, I am doing my best to avoid any direct involvement with your legal dispute while keeping my head down and addressing the legal matters for the benefit of the

Company and the three of you as shareholders.  Unfortunately, over the past two days I have been approached by essentially everyone working at the corporate office – agents and employees - expressing their fear and frustration over the current environment.  My response, has essentially been to do as I am doing which is put your head down and do your job.

While I appreciate the recent efforts to keep me out of the litigation, it is often times impossible given my responsibilities as General Counsel to this Company.  I was advised a few minutes ago that Brian Laffey is now moving into the office previously occupied by John Schoonmaker.  While I have no personal issue whatsoever with Brian, I was advised that there was a recent issue with Emmett and Brian that involved physical threats.  As a result, I was told that in the event Brian does move into the corporate office just a few feet from Emmett's office, Emmett will make immediate arrangements for full time security in the building.  Unless the goal is to have everyone working at Laffey join together and quit and bring an action for hostile work environment I would urge everyone to please keep the status quo and deal with this dispute in Court.  The litigation has already impacted the Sanders matter and everyone is doing their best to mitigate any further damage on day to day business.  However, the dispute has escalated over the past few days to the point of conversations involving armed security in the building – a situation that is clearly not in the best interest of the Company.  Again, this matter is scheduled to be heard in Court in just a few days and I cannot stress the importance of dealing with your issues in the appropriate forum and to make an effort to limit the impact of your dispute on the employees of this Company.  I simply cannot imagine an office workplace that involves armed security and it certainly is not beneficial to the Company and its image."

368.     Upon further information and belief, the sole purpose of this email was to further interfere with the business operations of LFH and the other Plaintiff Entities by threat of insurrection and an armed presence answering only to the Ringleader Defendants in the building.

## V. THE RINGLEADER DEFENDANTS' ROLE IN THE FRAUDULENT SCHEMES

369.     In addition to the actions specified above, the Ringleader Defendants have held themselves out to be agents, officers and executives of LFH subsequent to their resignation, termination and or removal from such positions.

370.     They have done so by sending fraudulent emails, posting fraudulent information on LFH's website and by posting fraudulent information on various real estate related websites such as the MLSLI.

371.     They have further done so by using LFH's property and logos at trade shows and other public gatherings.

**Emmett Laffey**

372.     On August 15, 2012, after he had been terminated and without approval from the LFH directors, Emmett held an unauthorized event for LFH agents and employees, the cost of which he attempted to charge to Philip's personal credit card. He instructed an LFH employee to use Philip's credit card for payment. When the employee refused, Emmett took a check from LFH's corporate account and attempted to pay for the event. That check was subsequently voided by Philip.

373.     Emmett has continually used emails and web-postings to hold himself out to be the CEO and manager of LFH when in fact he holds no such position.

**Scott Conlon**

374.     During the course of his employment with LFH, Conlon, a licensed attorney in New York, was engaged as General Counsel to the Laffey Family Businesses.

375.     At all times during his employment at LFH, Conlon, as General Counsel, had access to very sensitive confidential information of LFH and the other Plaintiff Entities, including lists of agents, lists of leads and customers, salary and commission information, contract and employment information, marketing strategies, financial information, pricing information, legal strategies, contract negotiations and other data.

376.     Conlon has provided such confidential to the Defendants and has used such confidential information to the detriment of LFH and the other Plaintiff Entities.

377.     Conlon, despite his ethical obligations as an attorney, has admittedly withheld proprietary documents from LFH and turned them over to International and others, as illustrated in paragraphs 152-155, above.

378.    Conlon has additionally failed to disclose relevant information to Mark and Philip as officers and directors of LFH and the other Plaintiff Entities.

379.    He has further misled the officers and directors of LFH as to status of various matters, both in litigation and in transactional and corporate matters.

380.    Conlon's deceit only came to light after he went to work for International and caused to an affidavit to be filed with the Nassau County Supreme Court.

381.    Moreover, Conlon, as General Counsel, failed to notify and concealed from the other corporate officers that a federal class action lawsuit was filed against Emmett, First Allied, LFH, Laffey Associates, LLC, Colonial and Wells Fargo alleging improper practices at First Allied, including *inter alia* Conspiracy, Violations of RESPA and Violations of NY GBL § 349.

382.    While employed as General Counsel for LHF, Conlon made clear by his actions that his loyalties were to Emmett, International, and his co-conspirators in this unlawful and improper enterprise.

383.    For example, Conlon continued to accept new personal legal matters from Emmett, despite specific resolutions of the Directors of the companies that he not do personal legal work for any of the principals. Additionally, at the time of his resignation, Conlon admitted that 40% of his total income came from outside, third party legal matters that Emmett funneled to him.

384.    On October 5, 2012, Conlon resigned as General Counsel to LFH.  Upon information and belief, Emmett immediately "hired" Conlon to become counsel to International or otherwise provide legal services to International.

**John Schoonmaker**

385.     Prior to September 5, 2012, Schoonmaker was a Senior Vice President of LFH and its most highly paid employee.

386.     At all times during his employment at LFH, Schoonmaker had access to certain confidential information of LFH and the other Plaintiff Entities, including, without limitation, lists of agents, employees and independent contractors, lists of leads and customers, salary and commission information, operations, marketing strategies, financial information, pricing information, business opportunities and other data.

387.     On September 5, 2012, Schoonmaker was terminated and given two week's severance from the employ of LFH for repeated and flagrant insubordination towards Mark and Philip. Schoonmaker was instructed not to enter the Greenvale Premises after his termination, but he continued to do so.

388.     Immediately, Emmett 'hired' Schoonmaker into International, an entity solely owned and controlled by Emmett.

389.     Emmett went so far as to have a desk, which is LFH property, moved into his private office within the corporate headquarters at the Greenvale Premises for the use of Schoonmaker, now an employee of International.

390.     Despite his termination from LFH, Schoonmaker has continued to hold himself out as an executive of LFH and has attempted to direct, supervise and control LFH's employees and agents, continued to contact employees and agents of LFH and certain of its related entities regarding steps to be taken by those employees and agents, and generally has continued to act as if his termination never occurred.  For example, Schoonmaker repeatedly attempts to show up for sales meetings and speak at LFH's branch managers' meetings.

391.     Emmett has endorsed and enabled these actions by Schoonmaker.

392.     Schoonmaker has continued to use LFH assets and resources in the conduct of his day-to-day business, notwithstanding that the rewards of that business inure solely to the benefit of International.

**Gregory Berkowitz**

393.     From October 21, 2011 forward, Berkowitz was employed by LFH as its Regional Sales Director and one of its most highly paid employees.

394.     At all times during his employment at LFH, Berkowitz had access to certain confidential information of LFH and the other Plaintiff Entities, including, without limitation, lists of agents, employees and independent contractors, lists of leads and customers, salary and commission information, operations, marketing strategies  financial information, pricing information, business opportunities and other data.

395.     While employed by LFH, Berkowitz began sharing confidential information of LFH with another real estate brokerage, WP, an entity solely owned and controlled by Emmett.

396.     While employed by LFH, Berkowitz began steering property listings from LFH to WP and Pimenta and soliciting property listings on behalf of WP.

397.     Berkowitz, upon obtaining such listings, would "park" them in the name of another broker/agent at WP so that his name would not appear on the Multiple Listing Service, in order to avoid detection by LFH's employees and Mark and Philip.

398.     A realtor is required to list his license affiliation with the NYS Department of Education. Further, a realtor is required to honestly disclose affiliations when reporting listings and transactions to MLSLI.

399.    Berkowitz improperly solicited these listings for WP while his license listed him as an employee/agent at LFH, and he improperly assisted in the reporting of these transactions to MLSLI as WP transactions.

## VI. RACKETEERING ACTS RELATED TO MAIL AND WIRE FRAUD

### A. Bank Fraud

400.    18 U.S.C. § 1344 provides that:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

401.    On or about October 3, 2012, Defendants obtained a check payable to LFH, in the amount of $54,920.00, representing a sales commission due to LFH.  That check was taken and converted by Emmett who deposited said check an account at the Roslyn Savings Bank into an account in the name of International, upon information and belief using a forged endorsement.

402.    On or about Friday, September 21, 2012, Defendants obtained a check payable to LFH in the amount of Twenty Thousand Seven Hundred Seventy Five Dollars ($20,775), representing the commission due to LFH on the sale of a property. That check was taken and converted by Emmett who deposited said check an account at the Roslyn Savings Bank into an account in the name of International, upon information and belief using a forged endorsement.

### B. Defendants use of the Telephones and Wires to Further the Scheme

403.    18 U.S.C. §1343 provides, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of

wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

404.    On June 12, 2012, at about 5:46 p.m., two days subsequent to his termination as an employee and/or officer of LFH, Emmett made use of LFH's company email to send an email letter to all of LFH's branch managers which falsely and fraudulently asserted that he was 'still in control.' Beyond a blathering diatribe resplendent in its misspellings and grammatical errors, the email stated, *inter alia*: "Good afternoon my dear Managers! ... Your fearless leader is alive and well and everything is BUSINESS AS USUAL except there will be some minor changes moving forward. Please know that everything you heard out of Phils or Marks mouth is null and void. While these two ... have plotted to vote me out from being a director in all the companies I have founded and or created means ZERO. If they like telling everyone they are the only company directors, then good for them. ... At the next managers meeting I will go back to the way it was a long time ago. I will again furnish you with tips and techniques to make you more profitable. Where I spend my time the people around me make a lot of money. The Greenvale building and First Allied Mortgage are printing cash. First Allied is setting records! I will share with you everything I can for you to have similar results. .. As always I am on standby for you for anything you may need especially hiring a new experienced agent that may be the next great asset of your office. I HAVE NEVER BEEN MORE MOTIVATED TO LEAD YOU TO SUCCESS!"

405.     The underlying purpose of sending this email was to create discord and disrupt the operations of the company.

406.     Prior to this time, Emmett rarely, if ever, attended the bi-weekly LFH manager's meetings and had not attended one for two years prior to his removal. During this time, Philip and Mark took responsibility for holding manager's meetings.

407.     On June 17, 2012, at 6:09 p.m., Emmett sent an email to LFH's managers and staff utilizing LFH's company email which again fraudulently held himself out to be controlling the companies: "As I promised to you at last weeks managers meeting its important to me to get your input as to the current direction of the company... It is my goal to increase your passion and motivation to make the company as profitable as possible... If you are really happy and your income is increasing the office will benefit dramatically... I believe that if your voice is heard and we can collaborate on ideas and initiatives to motivate you and your office the end result will be Laffey Fine Homes will rise back to the position we were in two or three years ago... This is your opportunity to get involved in a new wave of policies and changes that will be made.  Speak now or forever hold your peace. Email me your thoughts, call me if you wish, or stop by my office to discuss. We are going to move back towards the top of all LI and Queens firms. Together we can accomplish everything."

408.     The underlying purpose in transmitting this email was to create discord and disrupt the operations of the company.

409.     On August 14, 2012 at 3:28 p.m., Emmett sent an email message utilizing LFH's email to all the managers at LFH instructing them to attend a conference in Providence, Rhode Island in which he falsely, fraudulently and without authority represented that LFH would pay for attendance and hotel rooms. He wrote "All managers to attend Sept 5[th] to 6th, ONE NIGHT

all north shore managers to attend TWO NIGHTS… the Company will pay for the cost of the meetings plus the hotel room.  You are responsible for your own transportation."

410.     The underlying purpose in transmitting this email was to create discord and disrupt the operations of the company.

### C. Pattern

411.     Each of such communication, check endorsement and deposit, during the period constituted a separate execution of the scheme through mails and interstate wire communications.

412.     Each such communication accomplished, among other things, the purpose of retaining the fruits of the scheme by the Defendants in the form of increased profits and improper benefits to them, as well as diminution of the value of LFH and its affiliated companies.

413.     The foregoing predicate acts, taken together, constitute a pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(1)(B).  The predicate acts are both related and continuous. The acts are connected to one another as part of a scheme to accomplish a uniform purpose of defrauding Plaintiffs of income and property. The repeated and ongoing nature of this conduct during the period of the scheme and the threat of similar conduct occurring the future makes the acts continuous.

### AS AND FOR A FIRST CLAIM FOR RELIEF
(Declaratory Judgment)

414.     Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 413 above.

415.     Pursuant to 18 U.S.C. 1964 (a), "The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any

interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons."

416.     As a result of all of the foregoing, Plaintiffs and each of them are entitled to a judgment declaring that the Enterprise Defendants are unlawful competing entities and enjoining and restraining them from competing with Plaintiffs and each of them.

### AS AND FOR A SECOND CLAIM FOR RELIEF AGAINST THE RINGLEADER DEFENDANTS
(Violation of RICO, 18 USC §1962 (b))

417.     Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 416 above.

418.     INTERNATIONAL is an ongoing "enterprise" as that term is defined in 18 U.S.C. §11961(4), that engages in activities which affect interstate commerce.

419.     Emmett, Berkowitz, Schoonmaker and Conlon knowingly have acquired and/or maintain, directly or indirectly, interest in or control of the Enterprise Defendants through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1343 based upon the use of wires to facilitate the scheme complained of herein.

420.     Plaintiffs have been injured in their business and property by reason of the above described conduct in that they have been defrauded of money, business opportunities, had their property converted and their businesses subverted.

421.    By reason of their injuries, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other and further relief as the Court deems just and proper.

### AS AND FOR A THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
(Violation of RICO, 18 USC §1962 (c))

422.    Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 421 above.

423.    Each of International and WP is an ongoing "enterprise" as that term is defined in 18 U.S.C. §1961(4), that engages in activities which affect interstate commerce.

424.    All Defendants and each of them knowingly have conducted and/or participated, directly or indirectly, in the conduct of International's affairs any through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. 1343 based upon the use of the wires to conduct and facilitate the scheme complained of herein.

425.    Plaintiffs have been injured in their business and property by reason of the above described conduct in that they have been defrauded of money, business opportunities, had their property converted and their businesses subverted.

426.    By reason of their injuries, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other and further relief as the Court deems just and proper.

### AS AND FOR A FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
(Violation of RICO, 18 USC §1962 (d))

427.    Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 426 above.

428.     International is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

429.     Defendants and each of them have been employed by or associated with International and/or WP.

430.     Defendants and each of them knowingly have agreed, combined and conspired to conduct and/or participate directly or indirectly, in the conduct of International's and/or WP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. 1343 based upon the use of wires to commit and facilitate the acts complained of herein.

431.     Defendants and each of them knew of and agreed to act in furtherance of the common and overall objective (i.e. to defraud) by performing or facilitating the acts complained of herein.

432.     Plaintiffs have been injured in their business and property by reason of the above described conduct in that they have been defrauded of money, business opportunities, had their property converted and their businesses subverted.

433.     By reason of their injuries, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other and further relief as the Court deems just and proper.

## AS AND FOR A FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
### (Common Law Fraud)

434.     Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 433 above.

435.     Defendants and each of them knowingly and intentionally committed the acts alleged herein including without limitation the false statements as to their affiliation with LFH,

the improper endorsements on checks, the false statements about the future of the plaintiff businesses, etc.

436.    They did so for the express purpose of deluding specific persons and entities, including employees of the plaintiff businesses, about the conduct, health and affairs of the plaintiff businesses, and for the purpose of covering up their thefts and other improper actions.

437.    Plaintiffs, and the general public, relied on those statements and actions.

438.    Plaintiffs and the general public were justified in that reliance.

439.    As a direct result of that reliance and of the defendants' statements and actions, plaintiffs have been damaged in an amount to be proven at trial.

<u>AS AND FOR A SIXTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS</u>
(Aiding and Abetting Fraud)

440.    Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 439 above.

441.    Defendants and each of them have conspired with each other, aided and abetted each other in committing the actions complained of herein and committing the frauds complained of herein.

442.    As a result of all of the foregoing, Plaintiffs and each of them have been damaged in an amount to be proven at trial.

<u>AS AND FOR A SEVENTH CLAIM FOR RELIEF AGAINST EMMETT LAFFEY,
GREGORY BERKOWITZ, JOHN SCHOONMAKER, SCOTT CONLON, QUONTIC BANK,
IRINA PASHINSKY, DORA ZELYAKOVSKYand KAREN BERKOWITZ LAFFEY</u>
(Unjust Enrichment)

443.    Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 442 above.

444.    As a result of receiving salary payments during the time he was failing to perform his duties in a faithful and loyal manner, Defendant Schoonmaker was unjustly enriched in an amount in excess of $100,000.

445.    As a result of receiving commissions on sales he withheld from his employer, Defendant Berkowitz was unjustly enriched in amount approaching Two Hundred and Ninety Seven Thousand Three Hundred and Fifty-Four Dollars ($ 297,354.00).

446.    As a result of receiving salary payments during the time he was failing to perform his duties in a faithful and loyal manner, Defendant Conlon was unjustly enriched in an amount in excess of $100,000.

447.    As a result of their conversion of the assets and property of Colonial and acts in concert with each other and the Ringleader Defendants to create a new joint mortgage brokerage venture, Defendants Quontic Bank, Irina Pashinsky and Dora Zelyakovsky have been unjustly enriched in an amount to be proven at trial.

448.    As a result of her conspiracy and action in concert with the Ringleader Defendants and in particular Emmett, Karen Berkowitz Laffey has been unjustly enriched in an amount to be proven at trial.

### AS AND FOR AN EIGHTH CLAIM FOR RELIEF AGAINST EMMETT LAFFEY
(Breach of Fiduciary Duty)

449.    Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 448 above.

450.    In contravention of his fiduciary duty as such employee, officer and managing member and/or director of the Plaintiff Entities, Emmett has been improperly diverting and using corporate assets of the Plaintiff Entities for his own benefit, has been improperly taking funds from at least one or more of the Plaintiff Entities, and has usurped corporate opportunities.

451.    In contravention of his fiduciary duty as such employee, officer and managing member and/or director of the Plaintiff Entities, Emmett has engaged in patterns and practices that have damaged the corporate businesses, usurped corporate opportunities and converted corporate income and assets to his own benefit.

452.    As a result of all of the foregoing, Plaintiffs and each of them have been damaged in an amount to be proven at trial.

<u>AS AND FOR A NINTH CLAIM FOR RELIEF AGAINST BERKOWITZ, CONLON,<br>ROGERS, BRIX, BABAEV, McCRAY, TUBBS, DeCLARA, CERETTA, SCHOONMAKER,<br>BUSTO and LUPO</u><br>(Faithless Servant)

453.    Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 452 above.

454.    As agents or employees of LFH or other Plaintiff Entities, Berkowitz, Schoonmaker, Conlon, Rogers, Brix, Babaev, McCray, Tubbs, DeClara, Ceretta, Busto and Lupo were inherently obligated to be loyal to their employer and were prohibited from acting in any manner inconsistent with their agency or trust and were at all times bound to exercise the utmost good faith and loyalty in the performance of their duties.

455.    In providing confidential and proprietary material of their employer to a competitor, Berkowitz, Schoonmaker, and Conlon engaged in misconduct and faithlessness that breached the terms of their employment with LFH.

456.    In providing confidential and proprietary material of eRealty to the Ringleader Defendants, and therefore indirectly to Hein and Lincoln, competitors of eRealty, Lupo engaged in misconduct and faithlessness that breached the terms of her employment with eRealty.

457.    In creating an atmosphere of turmoil, stress and enmity at LFH's Syosset office that encouraged others to leave LFH and made it easier for Ringleader Defendants to entice them

to leave the employ of LFH, Busto engaged in misconduct and faithlessness that breached the terms of her employment with LFH.

458.     In soliciting listings for his own financial benefit on behalf of another brokerage, Berkowitz engaged in misconduct and faithlessness that breached the terms of his employment with LFH.

459.     In steering sales and/or listings away from his employer to a competitor for his own financial and pecuniary interests, Berkowitz engaged in misconduct and faithlessness that breached the terms of his employment with LFH and violated his duty of loyalty to his employer, LFH.

460.     In steering listings away from their employer to a competitor for their own financial and pecuniary interests Rogers, Brix, Babaev, McCray, Tubbs, DeClara and Ceretta engaged in misconduct and faithlessness that breached the terms of their employment and/or agency relationship with LFH and violated their duty of loyalty to LFH.

461.     In soliciting listings for his own financial benefit on behalf of another brokerage and attempting to conceal the same, Berkowitz failed to disclose any interest which would naturally influence his conduct in dealing with the subject of his employment with LFH.

462.     In soliciting listings for his own financial benefit on behalf of another brokerage, Berkowitz engaged in misconduct and faithlessness that breached his fiduciary duties and duties of loyalty to his employer, LFH.

463.     In "parking" listings in the name of another, Berkowitz engaged in misconduct and faithlessness as he sought to conceal interests which were contrary to the terms of his employment and his duty of loyalty to his employer evincing knowledge that his conduct was improper.

464.     In soliciting agents and recruits for his own financial benefit on behalf of another brokerage, Berkowitz engaged in misconduct and faithlessness that breached the terms of his employment with LFH.

465.     Upon information and belief, Berkowitz "parked" listings for real estate sales with a combined asking price of Four Million Nine Hundred Fifty-Five Thousand and Nine Hundred Dollars ($ 4,955,900.00) and represented a potential broker's commission in the amount of Two Hundred and Ninety Seven Thousand Three Hundred and Fifty-Four Dollars ($ 297,354.00).

466.     In soliciting agents and recruits for his own financial benefit on behalf of another brokerage, Schoonmaker engaged in misconduct and faithlessness that breached the terms of his employment with LFH.

467.     In steering agents and recruits away from his employer to a competitor for his own financial and pecuniary interests, Schoonmaker engaged in misconduct and faithlessness that breached the terms of his employment with LFH and violated his duty of loyalty to his employer, LFH.

468.     In soliciting agents and recruits for his own financial benefit on behalf of another brokerage and attempting to conceal the same, Schoonmaker failed to disclose any interest which would naturally influence his conduct in dealing with the subject of his employment with LFH.

469.     In breaching his ethical obligations to LFH and sharing its confidential information with opposing parties, Conlon breached the terms of his employment with LFH and violated his duty of loyalty to his employer, LFH.

470.     As a result of the foregoing, Plaintiffs have suffered damages in an amount equal to the salary paid Berkowitz, Conlon and Schoonmaker from the time they began to be disloyal to Plaintiff.

471.     Plaintiffs have been further damaged in the amount of potential commissions retained by Berkowitz and not paid to Plaintiff as a result of Berkowitz's disloyal and faithless performance of his obligations to Plaintiff.

472.     Plaintiff LFH has been damaged by Berkowitz' faithless performance of his duties and obligations to Plaintiff.

473.     Plaintiff LFH has been damaged by Schoonmaker's faithless performance of his duties and obligations to Plaintiff.

474.     Plaintiff has been damaged by Conlon's faithless performance of his duties and obligations to Plaintiff.

475.     Plaintiff eRealty has been damaged by Lupo's faithless performance of her duties and obligations to Plaintiff.

476.     Plaintiff LFH has been damaged by Busto's faithless performance of her duties and obligations to Plaintiff.

477.     Plaintiff LFH has been damaged by Tubbs' faithless performance of his duties and obligations to Plaintiff.

**JURY DEMAND**

478.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs respectfully pray for judgment to be entered in their favor on

their Compliant and against the Defendants as set forth herein.

DATED:     Garden City, New York
              January 29, 2013

                    Respectfully submitted,

                    BLODNICK FAZIO & ASSOCIATES, P.C.
                    Attorneys for Plaintiffs

By:    _____
                    Edward K. Blodnick (EB1796)
                    Thomas R. Fazio (TF0871)
                    Steven R. Talan (ST5353)
                1325 Franklin Avenue, Suite 555
                Garden City, New York 11530
                (516) 280-7105
                eblodnick@blodnickfaziolaw.com

## VERIFICATION

STATE OF NEW YORK    )
                            ) ss.:
COUNTY OF NASSAU    )

MARK LAFFEY, being duly sworn, deposes and says:

I am one of the Plaintiffs herein and an officer of the corporate Plaintiffs in the within

action.  I have read the foregoing Complaint and know the contents thereof; and the same is true

to my own knowledge, except as to the matters therein stated to be alleged upon information and

belief, and as to those matters I believe them to be true.

Dated:  Garden City, New York
         January  2 9 , 2013

                                   MARK LAFFEY

Sworn to before me this
2 9 day of  JANUARY 2013

_____
Notary Public

        THOMAS FAZIO
   Notary Public, State of New York
      No. 01FA4839382
   Qualified in Nassau County
   Commission Expires  7-10-14

**VERIFICATION**

STATE OF NEW YORK    )
                      ) ss.:
COUNTY OF NASSAU    )

     PHILIP LAFFEY, being duly sworn, deposes and says:

     I am one of the Plaintiffs herein and an officer of the corporate Plaintiffs in the within action. I have read the foregoing Complaint and know the contents thereof; and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: Garden City, New York
       January 2 9 , 2013

                                     PHILIP LAFFEY

Sworn to before me this
2 9 day of January 2013

Notary Public

THOMAS FAZIO
Notary Public, State of New York
No. 01FA4839382
Qualified in Nassau County
Commission Expires 7 -10 -14

2:23 PM

01/22/13

# Laffey Fine Homes - HQ
## Vendor QuickReport
### All Transactions

| Type | Date | Num | Memo | Clr | Debit | Credit |
|---|---|---|---|---|---|---|
| **Emmett Laffey** | | | | | | |
| Check | 2/24/1999 | 5425 | Reimbursement HQ Expenses | X | | 359.30 |
| Check | 6/20/2000 | 9413 | Reimbursement HQ Expenses | X | | 438.59 |
| Check | 8/29/2000 | 10432 | Down Payment Deposit | X | | 10,000.00 |
| Check | 8/29/2000 | 10433 | Down Payment Deposit | X | | 1,000.00 |
| Check | 8/29/2000 | 10434 | Down Payment Deposit | X | | 1,000.00 |
| Check | 8/29/2000 | 10435 | Down Payment Deposit | X | | 1,000.00 |
| Check | 8/29/2000 | 10436 | Down Payment Deposit | X | | 1,000.00 |
| Check | 8/29/2000 | 10437 | Down Payment Deposit | X | | 1,000.00 |
| Check | 11/17/2000 | 11702 | Partial Loan Repayment | X | | 50,000.00 |
| Check | 3/21/2001 | 13486 | 3782-054970-72008 | X | | 725.05 |
| Check | 3/28/2001 | 13633 | Reimbursements | X | | 2,489.35 |
| Check | 6/6/2001 | 15085 | Reimbursements | X | | 733.55 |
| Check | 7/17/2001 | 15956 | Reimbursements | X | | 993.20 |
| Check | 7/23/2001 | 16068 | Reimbursements | X | | 260.40 |
| Check | 8/24/2001 | 16818 | Reimbursements | X | | 763.30 |
| Check | 8/27/2001 | 16842 | VOID: Reimbursements | X | 0.00 | |
| Check | 6/14/2002 | 22543 | Reimbursements | X | | 405.59 |
| Check | 9/23/2002 | 24672 | VOID: Loan Repayment | X | 0.00 | |
| Check | 10/25/2002 | 25303 | Loan Repayment | X | | 46,009.59 |
| Check | 8/13/2003 | 6304 | Reimbursement | X | | 800.00 |
| Check | 5/17/2004 | 15316 | Reimbursement | X | | 1,000.00 |
| Check | 9/23/2004 | 18771 | Reimbursement - Insurance - Land Cruiser | X | | 5,017.00 |
| Check | 10/12/2004 | 19279 | VOID: '04 Denecke/Robson 46-19 30th Rd., Astoria | X | 0.00 | |
| Check | 12/30/2005 | 31892 | Officer Loan Repayment | X | | 50,000.00 |
| Check | 3/3/2006 | 33361 | Officer Loan Repayment | X | | 45,000.00 |
| Check | 3/16/2006 | 33587 | Repayment on American Express charges | X | | 3,119.29 |
| Check | 4/7/2006 | 34192 | Loan Repayment | X | | 20,000.00 |
| Check | 4/27/2006 | 34643 | Distribution from Laffey.net | X | | 923.83 |
| Check | 8/30/2006 | 37725 | VOID: LV- Office Furniture | X | 0.00 | |
| Check | 8/30/2006 | 37752 | VOID: LV-Office furniture | X | 0.00 | |
| Check | 8/30/2006 | 37753 | LV-Reimbursement | X | | 3,000.00 |
| Check | 2/2/2007 | 41332 | LV-Reimbursement | X | | 3,000.00 |
| Check | 2/12/2007 | 41531 | VOID: File #1805485 '06 Relo Casesa/Daramdas 220-31 Jamaica Ave.,Queens Vill... | X | 0.00 | |
| Check | 6/26/2007 | 44509 | Distribution | X | | 50,000.00 |
| Check | 7/11/2007 | 44988 | VOID: Distribution | X | 0.00 | |
| Check | 7/11/2007 | 44995 | Distribution | X | | 50,000.00 |
| Check | 7/11/2007 | 44996 | Distribution | X | | 50,000.00 |
| Check | 7/11/2007 | 44997 | Distribution | X | | 50,000.00 |
| Check | 8/6/2007 | 45572 | Distribution | X | | 100,000.00 |
| Check | 9/11/2007 | 46369 | Distribution | X | | 100,000.00 |
| Check | 10/4/2007 | 46890 | | X | | 5,031.72 |
| Check | 11/9/2007 | 47609 | File #1972053 '07 Relo Puma/Bayardelle 52 Aldershot La, Manhasset | X | | 27,544.00 |
| Check | 11/9/2007 | 47614 | '07 Corey/Kafimian 6 Windsor Dr, Old Westbury | X | | 20,408.00 |
| Check | 11/12/2007 | 47626 | Distribution | X | | 25,000.00 |
| Check | 11/20/2007 | 47787 | Distribution | X | | 25,000.00 |
| Check | 11/28/2007 | 47951 | File #2010724 '07 Relo Suth/Filippelli 66 Chicken Valley Rd, Old Brookville | X | | 13,284.00 |
| Check | 3/27/2008 | 50321 | 08 Marino/Suth 37 Wellington Rd, Matinecock | X | | 87,500.00 |
| Check | 5/21/2008 | 51295 | Distribution | X | | 50,000.00 |
| Check | 7/23/2008 | 52525 | Distribution | X | | 75,000.00 |
| Check | 8/29/2008 | 53244 | File #2061979 '08 Relo Meizardeh/Soave 131 Knickerbocker Rd, Manhasset | X | | 32,114.63 |
| Check | 9/10/2008 | 53480 | Refund Overpayment Taxes - EL | X | | 57.33 |
| Check | 10/3/2008 | 53864 | Distribution | X | | 75,000.00 |
| Check | 10/20/2008 | 54147 | Distribution | X | | 75,000.00 |
| Check | 12/11/2008 | 55116 | | X | | 1,728.90 |
| Check | 1/10/2009 | 56027 | HQ-Reimbursement | X | | 55.00 |
| Check | 1/19/2009 | 56161 | HQ-Reimbursement | X | | 159.95 |
| Check | 1/30/2009 | 55852 | | X | | 1,444.44 |
| Check | 3/6/2009 | 56337 | Distribution | X | | 1,444.44 |
| Check | 3/11/2009 | 56442 | | X | | 1,444.44 |
| Check | 3/11/2009 | 56444 | Gas Reimbursement  2007-2009 | X | | 13,127.92 |
| Check | 3/30/2009 | 56660 | Reimbursement | X | | 43.99 |
| Check | 3/31/2009 | 56728 | APRIL DISTRIBUTION - MARCH ISSUED TWICE | X | | 1,444.44 |
| Check | 4/16/2009 | 56982 | Distribution | X | | 25,000.00 |
| Check | 4/27/2009 | 57110 | GR1-Meeting | X | | 78.00 |
| Check | 5/29/2009 | 57596 | | X | | 1,444.44 |
| Check | 6/22/2009 | 57940 | | X | | 30,000.00 |
| Check | 6/26/2009 | 58048 | | X | | 1,444.44 |
| Check | 7/20/2009 | 58420 | | X | | 50,000.00 |
| Check | 7/20/2009 | 58442 | File #2161862 '09 Relo Miocic/Reedy 110 Concord St, Westbury | X | | 6,660.21 |
| Check | 7/24/2009 | 58509 | | X | | 1,444.44 |
| Check | 8/25/2009 | 59027 | | X | | 75,000.00 |
| Check | 8/26/2009 | 59127 | | X | | 1,444.44 |
| Check | 9/3/2009 | 59274 | File #2114306 '09 Relo Gordon/Kim 2487 Cedar Swamp Rd, Brookville | X | | 6,350.00 |
| Check | 9/9/2009 | 59377 | File #2123422 '09 Relo King/Gordon 128 Vineyard Rd, Huntington | X | | 3,975.00 |
| Check | 9/9/2009 | 59407 | File #2114306 '09 Relo Gordon/Kim 2487 Cedar Swamp Rd, Brookville | X | | 11,601.45 |
| Check | 9/11/2009 | 59426 | File #2123422 '09 Relo King/Gordon 128 Vineyard Rd, Huntington | X | | 7,262.33 |
| Check | 9/14/2009 | 59459 | '09 Forte Realty/Tauber 4 Forte Dr, Old Westbury | X | | 27,226.80 |

**Laffey Fine Homes - HQ**
# Vendor QuickReport
**All Transactions**

2:23 PM
01/22/13

| Type | Date | Num | Memo | Clr | Debit | Credit |
|------|------|-----|------|-----|-------|--------|
| Check | 5/26/2011 | 68563 | '11 Mullaney/Huseby 343 Duck Pond Rd, Matinecock | X | | 72,504.00 |
| Check | 5/26/2011 | 68565 | '11 Bradley/Ricketts 30 Dickerson Ave, Bayville | X | | 5,882.40 |
| Check | 5/26/2011 | 68567 | '11 Estate Constr/Rubenstein 31 Sherwood La, Roslyn Heights | X | | 13,509.00 |
| Check | 5/26/2011 | 68573 | '11 Shea/Klein 137 7th Ave, Sea cliff | X | | 16,727.00 |
| Check | 6/8/2011 | 68717 | '11 Rusnack/Capobianco 48 Viola Dr, Glen Cove | X | | 7,196.70 |
| Check | 6/13/2011 | 68727 | '11 Riviera Dev/Jiayao 148-09 Northern Blvd,#1-M, Flushing | X | | 3,909.50 |
| Check | 6/23/2011 | 68973 | VOID: '11 Rental Doremus/Jurick 300 Jericho Tpke, Jericho | X | 0.00 | |
| Check | 6/24/2011 | 68999 | '11 Rental Doremus/Jurick 300 Jericho Tpke, Jericho | X | | 3,220.00 |
| Check | 7/19/2011 | 69330 | '10 Northern Lights/Lee 148-09 Northern Blvd,#6K, Flushing | X | | 4,191.50 |
| Check | 7/19/2011 | 69334 | '11 Northern Lights/Chou 148-09 Northern Blvd,#5D, Flushing | X | | 4,121.00 |
| Check | 7/29/2011 | 69588 | Addt'l charges for Company picnic | X | | 2,500.00 |
| Check | 8/4/2011 | 69597 | '11 DiPaolo/LaRosa 24 Maple Ave, Sea Cliff | X | | 6,151.36 |
| Check | 8/8/2011 | 69614 | '11 DiPaolo/LaRosa 24 Maple Ave, Sea Cliff | X | | 981.60 |
| Check | 8/10/2011 | 69689 | '11 Rental Guarino/Chicorelli 6 Beech Pl,#Studio, Huntington | X | | 200.00 |
| Check | 8/11/2011 | 69709 | VOID: '11 Rental Allen/Nikrant 433 Meadow Rd, Kings Park | X | 0.00 | |
| Check | 8/16/2011 | 69784 | VOID: '11 Appraisal 4 South View Court | X | 0.00 | |
| Check | 8/17/2011 | 69797 | HQ-Reimbursement | X | | 546.00 |
| Check | 8/17/2011 | 69822 | '11 Rental Island Prop/Martone 11 Burtis Ave, OB | X | | 1,225.00 |
| Check | 8/24/2011 | 69941 | '11 Mackintosh/Jones 13 Roosevelt St, Glen Cove | X | | 3,869.00 |
| Check | 8/31/2011 | 70315 | Distribution | X | | 100,000.00 |
| Check | 9/7/2011 | 70149 | '11 Rugel/Cannata 67 Sugar Maple La, Glen Cove | X | | 5,668.00 |
| Check | 9/7/2011 | 70153 | '11 Northern Lights/Hu 148-09 Northern Blvd,#6C, Flushing | X | | 5,108.00 |
| Check | 9/9/2011 | 70190 | VOID: '11 Pulaski/Marvin 34 Hillcrest Dr, Glen Head | X | 0.00 | |
| Check | 10/12/2011 | 70715 | '11 Appraisal 200 Scudders Lane | X | | 15.75 |
| Check | 10/18/2011 | 70769 | Partial Reimbursement Cancun Convention - 2011 | X | | 13,261.51 |
| Check | 10/20/2011 | 70809 | Reimbursement for Meadowbrook Polo Wine | X | | 270.93 |
| Check | 11/10/2011 | 71047 | Balance Reimbursement for Laffey Retreat | X | | 4,343.00 |
| Check | 11/11/2011 | 71090 | '11 Koeppel/Eleyahouzadeh 8 Blue Sea La, Kings Point | X | | 18,672.00 |
| Check | 11/16/2011 | 71165 | | X | | 34,386.04 |
| Check | 11/22/2011 | 71253 | '11 (N) Scherr/Abselet 19 Doral Dr, North Hills | X | | 6,284.25 |
| Check | 11/30/2011 | 71323 | '11 Rental Guarino/Chicorelli 6 Beech Pl,#Studio, Huntington | X | | 200.00 |
| Check | 11/30/2011 | 71321 | Cancun reimbursement | X | | 3,200.00 |
| Check | 11/30/2011 | 71324 | '11 Rental Allen/Nikrant 433 Meadow Rd, Kings Park | X | | 570.00 |
| Check | 11/30/2011 | 71325 | '11 Appraisal 4 South View Court | X | | 26.00 |
| Check | 11/30/2011 | 71326 | '11 Appraisal 200 Scudders Lane | X | | 15.75 |
| Check | 11/30/2011 | 71335 | '11 (N) Stanco/Johansen 6 Glen La, Glenwood Landing | X | | 3,773.30 |
| Check | 12/1/2011 | 71340 | Relo-Reimbursement | X | | 300.00 |
| Check | 12/13/2011 | 71472 | VOID: '11 (D) Northern Lights/Song 148-09 Northern Blvd,#1B, Flushing | X | 0.00 | |
| Check | 12/13/2011 | 71475 | VOID: '11 (D) Northern Lights/Kim 148-09 Northern Blvd,#5A, Flushing | X | 0.00 | |
| Check | 12/13/2011 | 71479 | VOID: '11 (D) Northern Lights/Liu 148-09 Northern Blvd,#2G, Flushing | X | 0.00 | |
| Check | 12/19/2011 | 71536 | VOID: '11 (D) Bharucha/Singh 11 White Birch Rd, Oyster Bay Cove | X | 0.00 | |
| Check | 12/20/2011 | 71542 | VOID: '11 (D) Bharucha/Singh 11 White Birch Rd, Oyster Bay Cove | X | 0.00 | |
| Check | 12/22/2011 | 71674 | VOID: '11 (D) Zori/Trotta 21 Prospect St, Glen Head | X | 0.00 | |
| Check | 12/23/2011 | 71682 | VOID: '11 (D) Zori/Trotta 21 Prospect St, Glen Head | X | 0.00 | |
| Check | 12/27/2011 | 71743 | VOID: '11 (D) Gallo/Loring 8 Gruber Dr, Glen Cove | X | 0.00 | |
| Check | 12/27/2011 | 71750 | VOID: '11 (D) DeRiso/Stingi 2 Windham Ct, Muttontown | X | 0.00 | |
| Check | 12/28/2011 | 71757 | VOID: '11 (D) Northern Lights/Song 148-09 Northern Blvd,#1B, Flushing | X | 0.00 | |
| Check | 12/28/2011 | 71758 | VOID: '11 (D) Northern Lights/Kim 148-09 Northern Blvd,#5A, Flushing | X | 0.00 | |
| Check | 12/28/2011 | 71759 | VOID: '11 (D) Northern Lights/Liu 148-09 Northern Blvd,#2G, Flushing | X | 0.00 | |
| Check | 12/28/2011 | 71760 | VOID: '11 (D) Zori/Trotta 21 Prospect St, Glen Head | X | 0.00 | |
| Check | 12/29/2011 | 71778 | VOID: '11 (D) Northern Lights/Pak 148-09 Northern Blvd,#1A, Flushing | X | 0.00 | |
| Check | 12/29/2011 | 71781 | VOID: '11 (D) Northern Lights/Pak 148-09 Northern Blvd,#1K, Flushing | X | 0.00 | |
| Check | 1/3/2012 | 71788 | VOID: '11 (D) Zori/Trotta 21 Prospect St, Glen Head | X | 0.00 | |
| Check | 1/3/2012 | 71789 | VOID: '11 (D) Gallo/Loring 8 Gruber Dr, Glen Cove | X | 0.00 | |
| Check | 1/3/2012 | 71790 | VOID: '11 (D) DeRiso/Stingi 2 Windham Ct, Muttontown | X | 0.00 | |
| Check | 5/15/2012 | 73599 | VOID: HQ- Reimbursement | X | 0.00 | |
| Check | 8/31/2012 | 75229 | VOID: JH- Emmett Laffey Reimbursement for Eataly | X | 0.00 | |
| Check | 9/25/2012 | 75579 | VOID: JH- Emmett Laffey Reimbursement for Eataly | X | 0.00 | |

**Tom Fazio**

| | |
|---|---|
| **Subject:** | FW: Laffey Fine Homes |



**From:** Jim Speer <jspeer@mlsli.com>
**Date:** Fri, 30 Nov 2012 09:22:23 -0500
**To:** plaffey@laffey.com<plaffey@laffey.com>
**Subject:** FW: Laffey Fine Homes

Hi Philip,

Joe forwarded me your email to look into.

On April 18, 2012 a letter was sent to our Data Entry department requesting that all active and under contract listings belonging to Maria Babaev, Regina Rogers, Dee Dee Brix, Natalie McCray and Lauren Biron be switched from the LAFF04 to the LAFF07 office.

The letter was signed by Ronni Calandros. Ronni has always been the person to send in changes from the corporate office so the request was processed at that time as usual.

Hopefully this answers the questions regarding the change of these listings.

Jim Speer
Vice President, Operations
Multiple Listing Service of Long Island, Inc
300 Sunrise Hwy
West Babylon, NY 11704
631-661-4800 x310
jspeer@mlsli.com


**From:** Philip Laffey [mailto:plaffey@laffey.com]
**Sent:** Tuesday, November 27, 2012 4:26 PM
**To:** jemottola@aol.com
**Cc:** 'Mark Laffey'
**Subject:** Laffey Fine Homes


Joe

Thank you for taking my call before

As I mentioned I am the Broker of Record for our office in Greenvale . Our code and branch at that location is  LAFF 04 and our office number there is 516-625-6666

On April 19,2012 approximately 14 listings were transferred out of LAFF 04 into LAFF 07. LAFF 07 is not a branch of my company. I am not the Broker of Record of that office. It is owned soley and entirely by Emmett Laffey

Please let me know the circumstances around this as I did not authorize these listings being moved from LAFF 04.

To the best of my knowledge the current listings which are still available that were moved are:

2477457

2466266

2323420

2438989

2438991

2440032

2405747

2402516

2484565

2483070

2472924

2520194 ( previously 2452867)

2426042

2477498

Besides these listings other listings that were under contract, or subsequently went to contract were also transferred without my knowledge. I am going to investigate that further and will provide you with the exact list shortly

Thank you for your attention to this matter

P-

   **Philip C. Laffey, Principal**
Office: (516)626-1500
Cell: (516)359-1489
plaffey@laffey.com
55 Northern Blvd.
Greenvale, NY 11548


This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

Opinions expressed in this email are those of the sender and do not necessarily represent those of the Company.